PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-4021
_____

UNITED STATES OF AMERICA

v.

DAVID L. CUNNINGHAM,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cr-298)
District Judge:  Hon. Arthur J. Schwab

_____

Argued
January 12, 2012

Before:  McKEE, *Chief Judge*, FUENTES, and JORDAN,
*Circuit Judges*.

(Filed: September 18, 2012)

_____

Kimberly R. Brunson   [ARGUED]
Lisa B. Freeland
Office of Federal Public Defender
1001 Liberty Avenue - #1500
Pittsburgh, PA   15222
        *Counsel for Appellant*

Rebecca R. Haywood   [ARGUED]
David J. Hickton
Soo C. Song
Office of the United States Attorney
700 Grant Street - #4000
Pittsburgh, PA   15129
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

David Cunningham appeals the September 27, 2010 judgment of the United States District Court for the Western District of Pennsylvania sentencing him to 210 months' imprisonment and 20 years' supervised release based on his conviction for the receipt and distribution of child

2

pornography, in violation of 18 U.S.C. § 2252(a)(2). At trial, the District Court allowed the government, over Cunningham's objection, to show the jury two videos containing seven different video clips totaling approximately two minutes as a sample of the child pornography that gave rise to the charges. Cunningham contends that, because the Court permitted the videos to be shown without first viewing the videos to determine whether the danger of unfair prejudice substantially outweighed their probative value, the Court erred and his conviction must be reversed. We agree that the District Court abused its discretion, not only by failing to review the videos prior to admitting them but also by allowing all of those videos to be shown to the jury, because the highly inflammatory nature of two of them clearly and substantially outweighed their probative value pertaining to the crimes charged. Those errors were not harmless, and we will therefore vacate and remand for a new trial.

## I.    Background

### A.    *Factual Background*

According to the government's evidence, Cunningham lived at 7 Mingo Creek Road, Eighty Four, Pennsylvania, a residence that he shared with two older siblings, Sarah and Harold.[1] His mother, Doris, also resided at that residence until her death in March 2007.

---

[1] For simplicity, and meaning no disrespect by over-familiarity, we will refer to Cunningham's relatives by their first names.

On June 19, 2007, Pennsylvania State Police Corporal Robert Erdely conducted an undercover online investigation of peer-to-peer file sharing networks.[2] During that investigation, Erdely discovered a computer with an IP address located in southwestern Pennsylvania sharing over 100 files on a peer-to-peer network known as Gnutella through a file sharing program known as LimeWire. After looking at hash values that were being shared by that computer, Erdely recognized, based on previous investigations, numerous files with a hash value suggestive of child pornography.[3] Through a feature within Gnutella, Erdely was able to make a direct connection between his computer to the computer sharing the files, and downloaded six movies. All six of the movies contained prepubescent children engaging in sexual activity. After reviewing the downloaded video files, Erdely obtained a court order to identify the IP address that had shared the files in question, and it was determined that the subscriber of the IP address

---

[2] Peer-to-peer file sharing networks "utilize[] the Internet to allow individuals to share data contained in computer files. [Peer-to-peer] file sharing can be used to share child pornography and trade digital files containing images of child pornography." *United States v. Stults*, 575 F.3d 834, 838 (8th Cir. 2009).

[3] Each hash value "is an alphanumeric string that serves to identify an individual digital file as a kind of 'digital fingerprint.' Although it may be possible for two digital files to have hash values that 'collide,' or overlap, it is unlikely that the values of two dissimilar images will do so." *United States v. Wellman*, 663 F.3d 224, 226 n.2 (4th Cir. 2011) (citation omitted).

was registered to Cunningham's deceased mother, Doris, at 7 Mingo Creek Road, Eighty Four, Pennsylvania.[4]

Thereafter, a federal search warrant was obtained for 7 Mingo Creek, and Erdely, along with another Pennsylvania state trooper and several FBI agents, executed the warrant on July 17, 2007. Although Cunningham was not at his residence when the investigators arrived, they identified themselves to Sarah and Harold, and explained to them the nature of the investigation. Sarah informed the investigators that the only working computer in the residence belonged to Cunningham and was located in his bedroom. Erdely and the agents then searched Cunningham's bedroom, where they found mail and paperwork addressed to Cunningham. Erdely seized the computer and undertook a preliminary review of its hard drive. During that review, Erdely found that 36 out of 212 shared files contained child pornography.

Cunningham returned to the residence while the search was ongoing. He admitted to installing LimeWire on his computer, and that he had used LimeWire to search for pornography in general. According to testimony from the FBI agents at trial, Cunningham also admitted that he had downloaded child pornography using LimeWire, had been looking at child pornography on the computer and on LimeWire since 2006, and had used search terms like "child," "kiddy," and "PTHC" [pre-teen hardcore] to download files

---

[4] The e-mail address associated with the internet account that the computer user chose was "reptilewild@comcast.net." The record indicates that, beginning in 1998, Cunningham had been involved in the care, breeding, trade, and exhibition of reptiles.

from LimeWire. There was also testimony that, after Erdely showed Cunningham the list of all of the file names on the seized computer, Cunningham acknowledged that those files were from his shared directory, and he estimated that child pornography comprised 20 to 30 percent of the material on his computer.[5]

Forensic analysis of the computer found in Cunningham's bedroom revealed that 46 of the 212 files in the shared directory contained child pornography. In addition, a search of a folder that contained files that were not completely downloaded revealed 11 more videos that contained child pornography. A list of search terms, many of which referred to child pornography, was also recovered from the computer. Subsequent to that analysis, Cunningham was arrested and charged in a three count indictment for receiving, possessing, and distributing child pornography. He pled not guilty to all charges.

B.    *Procedural History*

1.    *Pretrial Proceedings*

Prior to trial, Cunningham filed a Motion in Limine Concerning Pornographic Images and File Names. In that motion, he requested, pursuant to Federal Rule of Evidence 403,[6] an order precluding the government from showing the

_____

[5] Cunningham later testified to viewing child pornography in 2001 and 2006, but denied telling the investigators that he had downloaded child pornography or searched for it.

[6] Federal Rule of Evidence 403 provides: "The court

6

jury any of the child pornography videos recovered from the computer. Cunningham argued that, because he was stipulating that the government exhibits constituted child pornography, the probative value of any videos was substantially decreased. The District Court issued an order denying Cunningham's motion, allowing the government to publish "representative samples of the Child Pornography instead of the entire 'collections,' as well as the file names of the various files in the 'collection.'" (App. at 1.)[7] The Court's order also noted that "the parties may (but are not required to) stipulate that the child pornography evidence constitutes child pornography for the purposes of the Indictment." (*Id*.) Following the Court's direction to "meet in an attempt to stipulate to a Joint Cautionary Jury Instruction" (*id*.), the parties agreed to the following stipulation:

> [T]hat the video files obtained from IP address 71.206.239.202 on June 19, 2007, constitute visual depictions of real children under the age of 18 engaging in sexually explicit content. The parties further stipulate and agree that the video files recovered from the computer at 7 Mingo Creek Road on July 17, 2007, constitute visual

---

may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

[7] Citations to "(App. at [page number])" are to the Appellant's four volume appendix in the present appeal.

> depictions of real children under the age of 18 years of age engaging in sexually explicit conduct.

(*Id.* at 196-97.)

Five days later, Cunningham filed a Motion to Limit Evidence of Child Pornography. That motion, which noted that the government had provided defense counsel with the video clips that it intended to introduce at trial, described those proposed video excerpts in graphic detail:[8]

> These clips include graphic and haunting images of child pornography. Specifically, they include a close up of an adult woman licking a very young female child's genitalia – so young, in fact, the child appears to be a toddler; videos of penetration; several videos depicting children tied up and/or blindfolded, including images where a young, prepubescent girl was penetrated by an adult male while her ankles and wrists appeared to be bound to a table. Several videos showed the faces of the children. In every image where a face is shown, the body

---

[8] In many, perhaps most, opinions addressing child pornography prosecutions, it is possible to resolve the legal issues without subjecting the reader to the graphic and disturbing details of the pornography. Because of the character of the issues confronting us here, however, we cannot avoid the details. In fact, it will be necessary to provide more graphic detail later herein. *See infra* note 10 and accompanying text.

(specifically, breasts, genitalia, and lack of pubic hair) clearly, and unequivocally, proves that the image portrays a child. In one, a young girl is seen performing oral sex on an adult male, who ejaculates on her face, which is openly displayed for the camera.[9]

---

[9] The government did not provide a description of the proposed video excerpts to the District Court when arguing to the Court that those excerpts should be admitted. The only descriptions that the government had provided to the Court of any of the videos giving rise to the charges was in its response to a pretrial motion to suppress filed by Cunningham. In that response, the government gave brief descriptions of the six videos that Erdely had downloaded from the IP address during his undercover investigation on June 19, 2007. The descriptions provided to the Court were as follows (without the explicit file names):

[A] pre-pubescent female performs oral sex on an apparent adult male, and engages in sexual intercourse with an adult male;

…

[A] pre-pubescent female and male child engage in sex acts upon each other. The children are appear [sic] to be 10 years old;

…

[A] female child approximately 6 years-old performs oral sex on an adult male;

…

[A]n adult female performs oral sex on an infant

9

(*Id.* at 201 (internal footnote omitted).) Cunningham argued that those "images not only reveal children engaging in sexually explicit conduct; they are obscene, violent, and humiliating, necessarily conjuring feelings of disgust and blind rage." (*Id.*) Cunningham objected to the government's video excerpts and proposed that, if the Court was going to allow the government to introduce those exhibits, they should be limited in four ways: (1) only still images of any video should be shown; (2) no images, whether still or part of a video, should display bondage or actual violence, including the penetration of prepubescent children by adults; (3) no audio should accompany any of the video; and (4) the faces of any minors should be obscured from all images.

In response to that motion, the government agreed not to use audio in the video excerpts, but it "strenuously

---

> child approximately 2 years old;
>
> …
>
> [A]n apparent 12 year-old female is seen in the video dancing. The child pulls down her pants exposing her vagina and then pulls up her shirt exposing her breasts. The child appears to be pre-pubescent;
>
> …
>
> [A]n apparent 6 year-old male child (pre-pubescent) engages in sexual intercourse with an adult female.

(S. App. at 11-13.) As discussed later herein, excerpts from some of those six videos were eventually shown to the jury.

10

object[ed] to the [other] limitations urged by [Cunningham] as efforts to sanitize, distort and mitigate the force of evidence that constitutes the very evidence of the offenses charged." (*Id*. at 222.) The government argued that, even with the stipulation, it bore "an extremely high burden to establish … that the defendant *knowingly* distributed, received and possessed these images, that *he* was *aware* of their character as child pornography, [and] that he was aware that the images depicted *real* minors engaging in *sexually* explicit conduct." (*Id*. at 223.) Therefore, the government contended that "it would be unfair to say that, because the defendant offered to stipulate to some of what the government needs to prove, the government should be hindered in its ability to satisfy its remaining obligation of proof." (*Id*. at 223-24.)

In specifically arguing against the omission of excerpts that portray bondage and actual violence, the government noted that "[t]he average person … is not aware … [that] the content at issue … may contain depictions of sado-masochistic sexual abuse," and that child pornography, in general, contains "frequent depictions of the documented sexual assault of children by adults with whom they come into contact." (*Id*. at 226.) Thus, the government contended that the jury should be allowed to see such depictions to "fully appreciate the nature of child pornography crimes, which necessitates consideration of the images themselves." (*Id*. at 227.) The government represented that it had "pre-selected clips of videos that [were] representative of the full collection," and "propose[d] to admit and publish 7, several-second video clips, from in excess of 50 such videos, some of which were originally as long as 30 minutes." (*Id*. at 227.) The government asserted that it had been responsive to

11

Cunningham's concerns by "agree[ing] to omit one of two videos which depict[ed] sado-masochistic sexual abuse of minors." (*Id.*)

Relying only on the papers submitted, the District Court denied Cunningham's motion with the exception of granting his request – already agreed to by the government – that no audio be used in the video images presented. The Court held that the government was entitled to prove its case in the manner that it chose, although the Court noted its hope that the government would do so "in a condensed format." (*Id.* at 4.) Additionally, the Court found that "still images [were] not representative of the actual evidence in this case." (*Id.*) As to Cunningham's other requests, including for a prohibition of images that depicted actual violence, the Court decided it would not grant them because they would "restrict the actual character of the evidence." (*Id.* at 5.) In conclusion, the Court, without having watched the video excerpts, held that, "[a]fter conducting a balancing of the evidence under [Rule 403], the probative value of [the] evidence [was] not substantially outweighed by its prejudicial effect." (*Id.*)

At the final pretrial conference held on April 8, 2010, Cunningham advised the Court of his intent to file a motion for reconsideration of the video excerpts' admissibility, and asked the Court to review the excerpts prior to ruling. The Court immediately denied that motion, saying that counsel "had plenty of time to file motion after motion, which [counsel had] done." (*Id.* at 253.) The Court noted that it had "ruled again and again and again; and [was] sorry [counsel] [did not] like it, but … [counsel] [could not] come in every day and give us another snapshot and more motions, and the

12

next day another snapshot and more motions." (*Id*.) However, notwithstanding that oral ruling, the Court said that if Cunningham wanted to file a motion, he needed to do so by 4:00 p.m. that day.

Cunningham complied with that directive and filed the motion later that day. In the motion, Cunningham asserted that his defense was that someone else had downloaded, possessed, and distributed the child pornography at issue, and, in addition to the stipulation already made, he agreed that whoever possessed, received, and distributed those images would know that they depicted real children engaging in sexually explicit activity. As a result, he argued there was little value in presenting the video excerpts, especially considering "the uniqueness and significance of this type of contraband." (*Id.* at 265.) Therefore, Cunningham urged the Court to rule that the video excerpts were inadmissible, or alternatively, subject to further limitations. Once again, Cunningham requested that the Court view the video excerpts prior to making a ruling on their admissibility.

On April 12, 2010, the Court denied Cunningham's motion. The Court stated that Cunningham "cite[d] no case precedent for its proposition that the child pornography must be viewed by the Court or that it is a necessary exercise of the Court's discretion to do so." (*Id*. at 17.) The Court found that "the descriptions [of the video excerpts] [were] sufficient for [it] to rule [on the past and pending motions], since the descriptions [were] quite telling of the images and their graphic nature." (*Id*. at 17-18.) Thereafter, Cunningham proceeded to trial.

13

2. *Jury Trial*

a) Voir Dire

Prior to voir dire, Cunningham requested that the District Court advise all potential jurors that, if selected, they would "see a movie that shows a prepubescent minor being sexually penetrated by an adult," and "see graphic images of children, their genitals, and videos of illegal sexual acts, including oral sex, sexual intercourse, and graphic, violent, sexual images." (*Id*. at 170-71.)  The Court did not adopt that preview of the evidence.  Instead, during voir dire, the Court provided all potential jurors with the following information and asked them the following question:

> [T]his case involves an accusation that the Defendant received, possessed and distributed child pornography.  During this trial you will be shown child pornography including graphic images and hear descriptions of computer files including graphic and offensive file names which will certainly be disturbing to most if not all of you.

> Regardless of your feelings on this subject matter and the graphic nature of the material presented, are you able to render a fair and impartial verdict based solely on the evidence presented in this court and my instructions to you on the law?

(*Id*. at 302-03.)  After hearing that, several jurors responded that they might have difficulty being impartial, and, as a

14

result, were excused for cause. When counsel and the Court further questioned other jurors individually at sidebar regarding answers they had given about their impartiality, more detailed information on the pornography was revealed and a few of those jurors were subsequently excused for cause. One potential juror, after learning that the videos would show children under the age of eight, determined that it would be difficult to be impartial. Another potential juror was excused for cause after she indicated her distress at the revelation that the videos would include portrayals of children as young as toddlers being molested.

b)      Video Excerpts

During trial, over Cunningham's objection, the government offered into evidence, and played for the jury, two separate videos containing a total of seven video excerpts of the child pornography either obtained from the IP address registered to Cunningham's deceased mother or recovered from the computer seized from Cunningham's bedroom. The first video, approximately a minute in length, contained excerpts from three of the six videos that Erdely had obtained from the IP address on June 19, 2007. The following are descriptions of those video excerpts:[10]

---

[10] Although the government provided us with these very detailed descriptions of the seven video excerpts in its appellate brief, it did not provide any description of the excerpts to the District Court when it was arguing that the video excerpts should be admitted. *See supra* note 9. The summary of the video excerpts furnished to the District Court by Cunningham at the time was also graphic, *see supra* note 8 and accompanying text, but it did not contain the level of

15

[Excerpt 1[11] (20 seconds of total file length of 2:16):] The video depicts an adult woman licking and digitally manipulating the genitals of a very young appearing pre-pubescent child. At the end of the clip, the same woman is shown on her back, with a nude male pre-pubescent child facing her.

…

[Excerpt 2 (27 seconds of total file length of 1:30):] This video depicts two pre-pubescent boys engaging in vaginal intercourse with an adult woman. The woman is then depicted kissing their penises. A clothed adult male is then shown, and one of the pre-pubescent boys is seen unzipping the adult male's pants. In the next clip, which is of poor quality, the pre-pubescent child appears to be sucking on the adult male's penis while being coached by the adult female.

---

detail that the government has provided to us. To say that the government's descriptions of the video excerpts are loathsome is an understatement. However, we reproduce the full description of each video excerpt because, as mentioned earlier, *supra* note 8, an understanding of the aggregate effect of the content contained in each video excerpt bears on our holding in this case.

[11] For ease of reference to certain excerpts that are discussed later herein, we assign a number to each of the seven video excerpts.

…

[Excerpt 3 (18 seconds of total file length of 21 seconds):] A prepubescent female child is shown pulling her pants to expose her nude genitalia, which is undeveloped and lacks pubic hair. She then pulls up her shirt to reveal her breasts, which are undeveloped. Another child can be seen in the background, also exposing nude breasts which are undeveloped, the child could be a male or female child.

(Appellee's Br. at 16.)

The second video, also approximately a minute in length, contained excerpts from four of the more than forty videos seized from the computer found in Cunningham's bedroom following the execution of the search warrant. Those excerpts contained the following depictions:

[Excerpt 1 (17 seconds of total file length of 3:23):] Prepubescent female child is shown dropping skirt, and exposing her nude genitalia. This child is then depicted nude with rope encircling her breasts and going up to her neck. She is standing and appears to be suspended from a ceiling with her arms above her. An adult male stands behind her. He is aggressively manipulating her genitalia while masturbating himself. Child is then depicted with thicker rope retraining [sic] her, as she is reclined and tied to a bench. Rope binds her legs and midsection. She has a mask on her face. An adult male stands above her, and

manipulates her genitalia. The child flinches. The adult male stands over her and inserts his penis into her mouth.

…

[Excerpt 2 (20 seconds of total file length of 14:12):] Prepubescent nude female child performs oral sex on an adult male, while straddling him from above. Her genitals appear to be in the area of his head or face. Child then shown lying beside with [sic] the adult male, with her hand in [sic] his erect penis. Video then depicts a close-up of the child's genitalia, she is on all fours peering back between her legs at the camera. The adult male is manipulating her genitals for the camera with his thumb. Adult male is then shown masturbating, the child is standing or kneeling with her mouth near his penis. There are multiple shots of the child handling the adult male's penis. The final clip shows the child, nude with ejaculate on her face and chest as she looks at the camera.

…

[Excerpt 3 (17 seconds of total file length of 2:55):] This video depicts a very young (perhaps 3-5 years of age) nude female child being suspended upside down, while an adult male vaginally penetrates her with his penis. The screen then depicts a close up of an adult male penis being forced into a child's vagina

18

while the child is held upside-down by the adult male. The video finally depicts a close up view of an adult male anally penetrating the child from behind. The adult male withdraws his penis, and ejaculates upon the back of the child.

…

[Excerpt 4 (14 seconds of total file length of 21 seconds):] A female prepubescent child pulls down her pants while facing a webcam and displays her buttocks and genitals.

(*Id.* at 17-18.) Both before and after each of the video excerpts were played for the jury, the District Court read a cautionary instruction, which directed the jury to view the images in a fair and impartial manner.

### 3. *Conviction and Sentencing*

The jury convicted Cunningham on all counts.

On September 27, 2010, the District Court sentenced Cunningham to 210 months' imprisonment for receiving child pornography in violation of 18 U.S.C. § 2252(a)(2) ("Count One"), and 120 months' imprisonment for distributing child pornography in violation of 18 U.S.C § 2252(a)(2) ("Count Three"), to be served concurrently. The District Court vacated Cunningham's conviction for possessing child pornography in violation of 18 U.S.C. § 2252(a)(4) ("Count Two") due to double jeopardy concerns, and dismissed that count without prejudice. The Court also imposed a 20-year term of supervised release, which included a condition

prohibiting Cunningham from accessing the internet during that period except for employment purposes.[12]

Cunningham timely appealed his conviction.[13]

--------

[12] Specifically, that condition provided:

The defendant is permitted to possess and/or use a computer and cell phone, however, is prohibited from accessing the Internet through any device. This prohibition includes using any Internet Service Provider, bulletin board system or any other public or private computer network or service. If the defendant's employment requires the use of a computer and/or access to the Internet, the defendant is permitted Internet access for this limited purpose, and the defendant shall notify the employer of the nature of his or her conviction (charge). The probation / pre-trial services officer shall confirm the defendant's compliance with this notification requirement.

(App. at 110.)

[13] On August 31, 2010, following Cunningham's conviction but prior to his sentencing, the Office of the Public Defender for the Western District of Pennsylvania ("OFPD") moved to disqualify the District Judge from presiding over this case and 20 other pending cases based on comments made by the District Judge in two unrelated cases where the OFPD served as defense counsel. Without recounting the tortuous history of those two cases, suffice it to say that the District Judge initially disqualified himself from Cunningham's case. On September 20, 2010, however, after

## II. Discussion[14]

Cunningham argues that the Court erred in both failing to view the video excerpts before ruling on their admissibility and in failing to exclude or limit them, given his stipulation to their criminal content. He further contends that the Court abused its discretion during voir dire by refusing to provide potential jurors with more detail describing the videos that would be presented during trial.[15] We address those arguments in turn.

---

the government filed a motion for reconsideration, the District Judge changed course and decided to continue to preside over Cunningham's case. On July 31, 2012, after Cunningham appealed to us and after we heard oral argument, the District Judge entered an order taking his original position that recusal was warranted and directing that, if we were to remand Cunningham's case for a new trial or re-sentencing, it should be assigned to another judge. In light of that order, the recusal issue is moot.

[14] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[15] Cunningham also challenges the District Court's disqualification ruling which, as noted, is now moot. *See supra* note 13. Cunningham additionally argues that the Court plainly erred by imposing, as a condition of his 20-year supervised release, a complete ban on internet access except for work purposes. Since we are vacating Cunningham's conviction, we need not directly address that contention. We do note, however, that the internet restriction imposed upon Cunningham is broader than the one that we found

21

A.    *Admission of Video Excerpts Under Rule 403*

We review a district court's ruling to admit or exclude evidence under an abuse of discretion standard. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010). "An abuse of discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable … .'" *Id.* (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)).

1.    *Procedural Error*

Cunningham contends that the District Court abused its discretion when it failed to view the government's proposed video exhibits before ruling on their admissibility. The government responds that the District Court had no duty to view the video excerpts because it understood the content and character of the excerpts that the government intended to offer from the summary that Cunningham had provided to the Court.[16]    We agree with Cunningham that, under the circumstances of this case, the Court abused its discretion by admitting the videos without first viewing them.

---

problematic in *United States v. Albertson*, 645 F.3d 191 (3d Cir. 2011), and we urge district courts, when imposing similar conditions, "to fashion a 'comprehensive, reasonably tailored scheme,'" *id.* at 200 (quoting *United States v. Miller*, 594 F.3d 172, 188 (3d Cir. 2010)).

[16] The government also reminds us that, prior to the motions in limine, it had told the Court about some of the videos in connection with Cunningham's suppression motion. *See supra* note 9.

While the question presented for resolution has seldom been addressed, we find guidance in decisions from two of our sister circuits. In *United States v. Curtin*, the defendant was charged with traveling across state lines with the intent to engage in a sexual act with a minor and using an interstate facility to attempt to persuade a minor to engage in sexual acts. 489 F.3d 935, 937 (9th Cir. 2007) (en banc). The only disputed issue was whether Curtin intended to engage in sex acts with a minor or with an adult who was pretending to be a child having incestuous sex with her father. *Id.* at 938-39. To prove Curtin's unlawful intent, the government offered five stories that had been found on his personal digital assistant, all of which involved sex between fathers and their child daughters. *Id.* at 942. Although Curtin objected to the evidence as inadmissible propensity evidence under Rule 404(a),[17] the district court, without reading all of the stories, agreed with the government that the stories in their entirety were, with a limiting instruction, admissible under Rule 404(b).[18] *Id.* The district court had read two of the stories in

---

[17] Subject to exceptions set forth in Rule 404(a)(2) and (3), Rule 404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).

[18] Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b)(2) provides that evidence otherwise inadmissible under Rule 404(b)(1) "may be admissible for another purpose, such as proving motive,

full, but it had only read "snippets" of the other three and relied on an offer of proof from the government for those stories. *Id*. at 956.

The Ninth Circuit reversed, "hold[ing] as a matter of law that a court does not properly exercise its balancing discretion under Rule 403 when it fails to place on the scales and personally examine and evaluate *all* that it must weigh" *Id.* at 958. It found that "[t]he inflammatory nature and reprehensible nature of [those] abhorrent stories, although generally relevant, is such that a district court making a Rule 403 determination must know precisely what is in the stories in order for its weighing discretion to be properly exercised and entitled to deference on appeal." *Id.* at 957. The Ninth Circuit stated that "[t]he record [in *Curtin*] demonstrate[d] why [that] must be the rule," since a portion of one of the stories that the government offered was clearly inadmissible as it was "both irrelevant and dangerously prejudicial."[19] *Id*. The Ninth Circuit noted that "[r]elying only on the descriptions of adversary counsel [was] insufficient to ensure that a defendant receives the due process and fair trial to which he is entitled under our Constitution." *Id.* at 958. Additionally, "given the depraved and patently prejudicial

_____

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

[19] Specifically, the Ninth Circuit pointed to one of the exhibits that contained "a particularly graphic description of [a minor female] engaged in sexual acts of mutual oral copulation with, and masturbation of, a dog." *Curtin*, 489 F.3d at 957.

nature of the irrelevant evidence," the court rejected the government's assertion that the error was harmless.[20] *Id.*

---

[20] The government argues that *Curtin* is distinguishable for several reasons: because a portion of one of the stories there was clearly inadmissible while the video excerpts here were, in fact, clearly admissible; because the evidence in *Curtin* was admitted under Rule 404(b)(2) and thus was extrinsic to the crimes charged, whereas here the video excerpts formed the basis of the crimes charged; and because the district court in *Curtin* did not have an understanding of all of the material in the stories, whereas here the Court understood the nature of the video excerpts. As we will discuss in greater detail *infra*, we disagree with the government's first contention. Regarding the second contention, although we recognize that the evidence here was offered to prove the mental state of the underlying crimes charged, as opposed to being offered to prove intent under Rule 404(b)(2), *Curtin*'s holding was not contingent on whether the challenged evidence was intrinsic or extrinsic to the crimes charged; rather, no matter the basis under which the evidence is being offered, it held that "[o]ne cannot evaluate in a Rule 403 context what one has not seen or read." *Curtin*, 489 F.3d at 958. We also disagree with the government's third assertion because the district court in *Curtin* had at least read two of the five stories and had offers of proof on the other three (albeit from adversary counsel). Here, even though the District Court had a description of the video excerpts from Cunningham (albeit in less detail than the government has provided to us on appeal), the District Court refused to watch any of the video excerpts.

In *United States v. Loughry*, the defendant was convicted of advertising and conspiracy to advertise child pornography, and distributing and conspiracy to distribute child pornography through an online cache.[21] 660 F.3d 965, 967-68 (7th Cir. 2011). However, Loughry was not charged with possession of child pornography. *Id.* at 968. To prove intent and motive to join the conspiracy, the government introduced, pursuant to Rule 414,[22] evidence of photographs and videos of child pornography found on Loughry's home computer. *Id.* at 969. Though some of the images were similar to those posted on the online cache, other images, classified as "hard core," *id.* at 969, "were more inflammatory and were prohibited by Cache 'rules,'" *id.* at 968. Additionally, the government did not charge Loughry with distributing or advertising any of those images submitted into

---

[21] In fact, the online depository was called the "Cache." *Id.* at 967. "[T]he purpose of the Cache was to provide its members with access to child pornography consisting of the lascivious exhibition of the genitals of minor girls." *Id.* at 968.

[22] Rule 414(a) provides that, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a). "The term 'child molestation' encompasses ... the distribution, advertising, or possession of child pornography." *Loughry*, 660 F.3d at 969 (citing Rule 414(d)). "Rule 414 constitutes an exception to the rule that evidence of prior bad acts is not admissible to show a defendant's propensity to commit the offense charged." *Id*.

evidence. *Id.* Nonetheless, the district court found that those images were admissible under Rule 414, *id.* at 968, even though it did not review the disputed evidence before admitting it, *id.* at 970. The district court readily acknowledged as much, stating that it was "at somewhat of a disadvantage not knowing exactly what items and depictions … [were] on [the] [g]overnment's [exhibits]," but still relied on the government's descriptions of the contested evidence when making its Rule 403 determination. *Id.*

The Seventh Circuit reversed, "emphasiz[ing] that a district court, in exercising its discretion under Rule 403, must carefully analyze and assess the prejudicial effect of challenged evidence." *Id.* at 971 (citations omitted). The Seventh Circuit did make clear, however, that an exception to reviewing contested evidence might exist in "cases where the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice to the defendant substantially outweighs any probative value the evidence might have." *Id.* (citing *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.")). "The safest course," the Seventh Circuit advised, "is for the court to review the contested evidence for itself." *Id.* Applying those principles, the *Loughry* court held that:

> The challenged videos include the kind of highly reprehensible and offensive content that might lead a jury to convict because it thinks that the defendant is a bad person and deserves punishment, regardless of whether the

27

defendant committed the charged crime. Given the inflammatory nature of the evidence, the district court needed to know what was in the photographs and videos in order for it to properly exercise its discretion under Rule 403. Without looking at the videos for itself, the court could not have fully assessed the potential prejudice to Loughry and weighed it against the evidence's probative value.

*Id.* at 972. The Seventh Circuit thus held that "the district court abused its discretion under Rule 403 when it failed to review the challenged videos before they were admitted in evidence." *Id.*

We note that, although the challenged evidence in *Loughry* did not form the basis of the underlying crimes, as did the videos in this case, the *Loughry* court, like the *Curtin* court, did not make a distinction between extrinsic and intrinsic evidence. Rather, the *Loughry* court focused on the inflammatory character of the evidence and concluded that "the district court needed to know what was in the photographs and videos in order for it to properly exercise its discretion under Rule 403." *Id.* The same rationale applies here. Because of the deeply disgusting, inflammatory character of the videos, the District Court "could not have fully assessed the potential prejudice" to Cunningham "and weighed it against the evidence's probative value" without looking at the video excerpts themselves. *Id.* Although the Court arguably had more vivid descriptions of some of the video excerpts than the district court did in *Loughry*, *see id.* at 972 ("Few if any, details were provided to the court when it was deciding whether to admit the evidence."), having those

descriptions should have heightened the District Court's awareness of the need to see the videos to assess their prejudicial impact before it decided to admit them.[23]

In sum, we find both *Curtin* and *Loughry* persuasive. We agree that a district court should know what the challenged evidence actually is – as opposed to what one side or the other says it is – "in order for [the court's] weighing discretion to be properly exercised and entitled to deference on appeal." *Curtin*, 489 F.3d at 957. We also agree that there may be instances where a district court can properly decline to view challenged evidence when it is obvious to the court that the danger of unfair prejudice from such evidence substantially outweighs any probative value that it might have. *Loughry*, 660 F.3d at 971.

Thus, we conclude that, speaking generally, a district court should personally examine challenged evidence before

---

[23] We emphasize that there was a stipulation in place here establishing the criminal content of the videos, and that too needed to be on the scales when assessing the probative value of the videos against the danger of unfair prejudice. *See infra* Part II.A.2. We do not imply that a defendant can stipulate away the prosecution's right to determine how to prove its case. *See Old Chief v. United States,* 519 U.S. 172, 183 n.7 (1997) (noting defendant cannot establish that district court abused its discretion "by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon"). But the existence of a stipulation of the kind in place here is a factor in the Rule 403 balancing that district courts must undertake.

deciding to admit it under Rule 403.[24]  However, as *Loughry* reflects, while that is the best course, *see* 660 F.3d at 971 ("The safest course, however, is for the court to review the contested evidence for itself."), it may be that, when a court has been provided with a sufficiently detailed description of the challenged evidence and decides to reject the evidence, it need not undertake that further review.  In other words, if, after reviewing a detailed description of the evidence, it is obvious to the court that the probative value of the evidence is so minimal that it is substantially outweighed by the danger of unfair prejudice, a court need not personally examine it. *See id*.  This ought not be seen as an invitation to freely deny

---

[24] The type of evidence at issue will determine what level of examination is in order.  Because of the impact that visual images may have on a jury, if that type of evidence is challenged on Rule 403 grounds, courts should be prepared to view it before putting it before a jury.  *Cf. United States v. Martin*, 746 F.2d 964, 972 (3d Cir. 1984) (citation omitted) ("Eyewitness testimony is often dramatic and convincing, but its effectiveness and convincing power are almost negligible in comparison with a film or videotape of actual events. When the videotape shows a crime actually being committed, it simply leaves nothing more to be said."); *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999) (finding that district court abused discretion in admitting photographs of spousal abuse over a Rule 403 objection in part because those "photographs impressed the fact of the domestic abuse on the jury's consciousness with dramatic, graphic impact, making clear the seriousness of the incident"); *United States v. Lopez-Medina*, 461 F.3d 724, 749 (6th Cir. 2006) ("Mug shots, in particular, are highly prejudicial, and their visual impact can leave a lasting impression on a jury.").

the admission of evidence that no one of ordinary sensibilities would want to review. Any such approach would, of course, be out of keeping with the district court's obligation, however uncomfortable, to weigh the potential probative and prejudicial impact of evidence, while considering the legitimate interests of both the prosecution and the defense.

The video excerpts here included "the kind of highly reprehensible and offensive content that might lead a jury to convict because it thinks that the defendant is a bad person and deserves punishment, regardless of whether the defendant committed the charged crime." *Id.* at 972. Although we accord district courts broad discretion in making a Rule 403 determination, that discretion is not unfettered. "The hackneyed expression, 'one picture is worth a thousand words' fails to convey adequately the comparison between the impact of the … portrayal of actual events upon the viewer of the videotape and that of the spoken or written word upon the listener or reader." *United States v. Martin*, 746 F.2d 964, 971-72 (3d Cir. 1984) (citation omitted). The District Court's refusal here to view the video excerpts to assess their prejudicial impact and instead, over objection, rely only on written descriptions prior to admitting them, was "arbitrary … [and] unreasonable." *Green*, 617 F.3d at 239 (citation and internal quotations marks omitted).

2. *Substantive Error*

Cunningham also argues that the District Court abused its discretion under Rule 403 by not limiting or excluding the video excerpts. Because the government had alternative means to present its case, including "witness testimony, still images, shorter video clips, [his] proffered stipulations,

31

and/or the actual stipulations" (Appellant's Reply Br. at 22), Cunningham asserts that the probative value of the video excerpts was substantially outweighed by the danger of their unfair prejudice.

In the main, the government is "entitled to prove its case free from any defendant's option to stipulate the evidence away." *Old Chief v. United States,* 519 U.S. 172, 189 (1997). That rule "rests on good sense" because "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." *Id.* Moreover, if the government uses testimony or other tangible evidence to describe a series of events, but then interrupts that pattern by "announcing a stipulation or admission, the effect may be like saying, 'never mind what's behind the door,' and jurors may well wonder what they are being kept from knowing," or whether the government is "responsible for cloaking something." *Id.* Thus, the Supreme Court has recognized that the "persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them." *Id.* at 187.

Under those well-established principles, the government is entitled to put forward relevant evidence it chooses to present its case. That evidence, however, remains subject to Rule 403. As noted earlier, *supra* note 6, Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice … or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The discretion district courts enjoy in this regard is broad indeed. "[I]f judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is

32

reviewed by an appellate tribunal." *Gov't of Virgin Islands v. Albert*, 241 F.3d 344, 347 (3d Cir. 2001) (citation and internal quotations marks omitted); *see Old Chief*, 519 U.S. at 183 n.6 (noting, in the context of Rule 403, that "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight"). However, because the District Court abused its discretion when it decided not to watch the videos before admitting them under Rule 403, its underlying Rule 403 determination is not entitled to the full range of deference that we would normally give to it on appeal. *See Curtin*, 489 F.3d at 957 (noting that district court must know precisely what the evidence contains "in order for its weighing discretion to be properly exercised and entitled to deference on appeal"). In that light, we conclude that the District Court did not properly exercise its discretion in admitting all of the video excerpts.

We begin our analysis by setting forth the elements of the charged crimes that the government had to prove. Counts One and Three were brought under 18 U.S.C. § 2252(a)(2), which provides that "any person who … knowingly receives, or distributes, any visual depiction … if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and … such visual depiction is of such conduct … shall be punished as provided in [§ 2252(b)(1)[25]]." 18 U.S.C. § 2252(a)(2). Count Two was brought pursuant to 18 U.S.C. § 2252(a)(4)(B), which

---

[25] Subject to exceptions not relevant here, 18 U.S.C. § 2252(b)(1) states, "[w]hoever violates … paragraph … (2) … of subsection (a) shall be … imprisoned not less than 5 years and not more than 20 years … ." 18 U.S.C. § 2252(b)(1).

provides that "any person who … knowingly possesses … video tapes … if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and … such visual depiction is of such conduct … shall be punished as provided in [§ 2252(b)(2)[26]]." 18 U.S.C. § 2252(a)(4)(B). The parties stipulated that the videos recovered contained "visual depictions of real children under the age of 18 years of age engaging in sexually explicit conduct." (App. at 196-97.)

The government argues that the video excerpts were "highly probative because the content of the videos verified the accuracy of many of the lurid file names the government had admitted into evidence," and "they also tended to show *knowledge* of the distribution, receipt and possession of child pornography." (Appellee's Br. at 42.) Even with the parties' stipulation, we recognize that showing the video excerpts here had some probative value because they had a tendency to show that the offender knew the videos contain child pornography. Although Cunningham correctly argues that the stipulation limited the probative value of those excerpts, he cannot dictate to the government how to prove its case. *Old Chief*, 519 U.S. at 183 n.7. Moreover, the agreed upon stipulation obviously falls far short of the evidentiary impact made by the video excerpts the government wanted to present. *See id.* at 187 (speaking of the "persuasive power of the concrete and particular[,]" and observing that "[e]vidence … has force beyond any linear scheme of reasoning, … with

---

[26] Subject to exceptions not relevant here, 18 U.S.C. § 2252(b)(2) states, "[w]hoever violates … paragraph (4) of subsection (a) shall be … imprisoned not more than 10 years … ." 18 U.S.C. § 2252(b)(2).

34

power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.")

In addition, the two separate sets of video clips each had probative value. The first set, which formed the basis for the distribution charge as set forth in Count Three, contained three excerpts from three of the six videos that Erdely recovered from the IP address registered to Cunningham's mother during Erdely's undercover investigation on June 19, 2007. The second set, which formed the basis for the receipt and possession charges as set forth in Counts One and Two, contained four excerpts from videos that were retrieved following the search and seizure of the computer found in Cunningham's bedroom on July 17, 2007. Thus, each of the video excerpts "was derived from files charged in the indictment; the images shown to the jury were … not extrinsic to the crime charged 'but rather a part of the actual pornography possessed.'" *United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008) (quoting *United States v. Dodds*, 347 F.3d 893, 898 (11th Cir. 2003)).[27]

----

[27] *Ganoe* also stated, however, that "[e]ven more importantly [for the Rule 403 analysis], for every image shown to the jury there was forensic evidence that the files had actually been opened and viewed after downloading." 538 F.3d at 1124. As Cunningham correctly notes, the government did not prove that the images shown to the jury had actually been opened and viewed. However, we do not hold that such forensic evidence is required to prove that video excerpts tend to show that a defendant knowingly possessed, received, or distributed child pornography. *See Dodds*, 347 F.3d at 899 (finding that the admission of images

Even though the two sets of videos were probative, however, the law of diminishing marginal returns still operates. The probative value of each clip was reduced by the existence of the clips before it. Once one video excerpt from each of the two videos was shown, the fact being proven – *i.e.*, that the person distributing, receiving, and possessing that pornography would know that it contained images of real minors engaging in sexually explicit activity – may well have been established. As a result, after one excerpt from each video was displayed, the probative value of the remaining excerpts became diminished because knowledge of distribution, receipt, and possession had already been established in some degree by the prior video excerpts. Thus, any of the three excerpts from the first video would have diminished probative value if one or two of the other video excerpts from the first video had already been shown. Likewise, any of the four excerpts from the second video would have diminished probative value if one or two of the other video excerpts from the second video had already been shown.

The question in the end, of course, is whether the probative value of the clips shown was substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

---

of child pornography tended to show that defendant knew the images were child pornography because there was testimony that defendant viewed adult pornography on his computer, and thus it was reasonable for the prosecution to show that defendant would have been aware that this was not adult pornography). Here, there was testimony that Cunningham had viewed both adult and child pornography.

As Rule 403 clarifies, a party is not protected from all prejudice – only unfair prejudice. *See* Fed R. Evid. 403; *see United States v. Bergrin*, 682 F.3d 261, 279 (3d Cir. 2012) ("It must always be remembered that *unfair* prejudice is what Rule 403 is meant to guard against … .").

Here, the aggregate risk of unfair prejudice was tremendous. Although the videos in question were not presented to this Court, the detailed descriptions we have received show that at least two of them should clearly have been excluded under Rule 403. Those two video excerpts, part of the second set of video clips, portray bondage or actual violence. Although all of the video excerpts are described as portraying deeply disturbing images, the descriptions of the depraved and violent sexual acts in Excerpt 1 and Excerpt 3 from the second video, *see supra* note 11 and accompanying text, let alone the actual video images, are enough to "generate even more intense disgust" and cause us to conclude that the videos themselves surely "outweigh[] any probative value they might have" as to the charges of knowingly distributing, receiving, and possessing child pornography.[28] *Curtin*, 489 F.3d at 964 (Kleinfeld, J., concurring); *see Loughry*, 660 F.3d at 974 (citing Judge Kleinfeld's concurrence in *Curtin* for the proposition that "video excerpts shown to the jury … [of] men raping and ejaculating in the genitals of prepubescent girls … have a strong tendency to produce intense disgust").

---

[28] We claim no expertise on the psychological impact that different types of child pornography may have on a jury, but think common sense dictates our conclusion.

"While all depictions of an adult engaging in sexual acts with a young child are bound to be repulsive, the impact on the jury will depend upon the nature and severity of the acts depicted." *Loughry*, 660 F.3d at 972. Even in the cesspool of evidence presented here, Excerpts 1 and 3 in the second set of video clips stand out. We will not repeat the description of them but note simply that their violent and sadistic character likely created "disgust and antagonism" toward Cunningham which risked "overwhelming prejudice" toward him.[29] *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993) (admission of testimony regarding videos "depicting bestiality and sadomasochism" created "disgust and antagonism toward" the defendant, "and resulted in overwhelming prejudice against him"). Without those two videos, the government still had the entire footage of the first

---

[29] With striking exaggeration, the government argues that "the record reflects that the district court used 'just about every tool at its disposal to minimize the inflammatory nature of the [video excerpts].'" (Appellee's Br. at 45 (quoting *Ganoe*, 538 F.3d at 1124).) Although the Court did give a cautionary instruction before and after the videos were played, there were a number of additional steps the Court could have taken to reduce the risk of unfair prejudice, including those suggested by the defense. *See supra* Part I.B.1. The Court did not watch the video excerpts prior to ruling on their admissibility and did not limit the government's video excerpts, except to order what the government had already accepted, namely eliminating the audio on the clips. Rather, the Court only hoped that the government would abide by its representation to present the videos in a condensed format.

set of videos and additional material from the second set.[30] We disagree with the government's contention, made to the District Court, that all of those video excerpts needed to be shown to "fully appreciate the nature of child pornography crimes." (App. at 227.) Given the other available evidence, the government did not need to show videos of pre-pubescent children being bound, raped, and violently assaulted to prove that Cunningham knowingly possessed, received, and distributed child pornography.[31] In addition, the more video excerpts were shown, the more it became a needless presentation of unfairly prejudicial and cumulative evidence. *See* Fed. R. Evid. 403.

---

[30] It also seems clear that the government had other evidence available to it from the child porn collection found on the computer seized from Cunningham's bedroom.

[31] We do not hold that violent videos like these, unspeakable though they are, would never be admissible. There may be circumstances where it would be appropriate to show them, given the crimes charged and the other evidence available. We only speak in the context of this case, in which there is ample evidence of the crimes charged without those extraordinarily prejudicial video clips. Nor does anything we have said here limit the government to offering at a retrial only the evidence that was adduced at the first trial. Likewise, nothing we have said prevents the District Court from excluding, after it has viewed them, more videos than the two we have discussed, if the Court, in its sound discretion, considers exclusion to be warranted under the Federal Rules of Evidence.

We recognize that a district court "is not required to scrub the trial clean of all evidence that may have an emotional impact.'" *Ganoe*, 538 F.3d at 1124 (citation and internal quotation marks omitted). Thus, we do not hold that the admission here of video excerpts or other images was *per se* improper. Indeed, courts are in near-uniform agreement that the admission of child pornography images or videos is appropriate, even where the defendant has stipulated, or offered to stipulate, that those images or videos contained child pornography. *See, e.g.*, *United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009); *United States v. Schene*, 543 F.3d 627, 643 (10th Cir. 2008); *Ganoe*, 538 F.3d at 1123-24; *United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008); *United States v. Sewell*, 457 F.3d 841, 844 (8th Cir. 2006); *Dodds*, 347 F.3d at 898-99. We also decline to adopt a bright-line rule on the number of video excerpts that can be shown or on the maximum length of time that video excerpts can last. However, in light of the content of the videos besides the bondage clips, the probative value of those two violent excerpts was extremely limited. Accordingly, this is a case where we can confidently say that the probative value of some of the video excerpts was "so minimal that it [was] obvious … that the potential prejudice to the defendant substantially outweigh[ed] any probative value that [they] might have." *Loughry*, 660 F.3d at 971 (citation omitted). Therefore, the Court abused its discretion in admitting the bondage videos.

The government argues that the District Court's errors do not require us to vacate Cunningham's conviction, contending that any error in admitting the video excerpts was harmless. "The test for harmless error is whether it is 'highly probable that the error did not contribute to the judgment.'"

*United States v. Vosburgh*, 602 F.3d 512, 540 (3d Cir. 2010) (quoting *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999)). "This '[h]igh probability' requires that the court possess a 'sure conviction that the error did not prejudice the defendant.'" *Id.* (alteration in original) (quoting *Dispoz-O-Plastics, Inc.*, 172 F.3d at 286). "Here, given the depraved and patently prejudicial nature" of at least two of the video excerpts, *Curtin*, 489 F.3d at 958, we do not have a sure conviction that the erroneous admission of those two excerpts did not prejudice Cunningham.

It is difficult to divorce the procedural error from the substantive error in this case. Procedural error often begets substantive error, and we believe that the substantive error of admitting all of the video excerpts here was prompted by the procedural error of failing to review those excerpts prior to ruling on their admissibility. *Cf. United States v. Goff*, 501 F.3d 250, 256 (3d Cir. 2007) (noting, in the sentencing context, that the substantive problems in the district court's opinion "[were] a product of the [d]istrict [c]ourt's procedurally flawed approach," and by "disregarding [sentencing] procedures, the [d]istrict [c]ourt put at risk the substantive reasonableness of any decision it reached"). Unless "the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice to the defendant substantially outweighs any probative value the evidence might have," *Loughry*, 660 F.3d at 871 (citation omitted), district courts should take the procedural step of personally examining disputed evidence in a case like this, prior to making a Rule 403 determination to admit the evidence.

B.    *Voir Dire*

Cunningham also argues that the District Court abused its discretion during voir dire by failing to publish the video excerpts to potential jurors that would be played during trial, or otherwise failing to inform them that there would be video excerpts shown of young children being sexually assaulted. Specifically, Cunningham claims that the District Court's questions during voir dire were too general for potential jurors to understand the "unfathomable nature of the evidence that would be presented at trial," and thus "any assurances of impartiality" given by potential jurors were "uninformed and unreliable in violation of [his] Sixth Amendment right to be tried by an impartial jury." (Appellant's Opening Br. at 106.) Although we reject Cunningham's assertion that the video excerpts to be shown at trial had to be played to all potential jurors during voir dire, his assertion that more information about the videos should have been provided to potential jurors does warrant further discussion.

One of the purposes of voir dire is to "enabl[e] the court to select an impartial jury," *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991), a purpose that implicates the Sixth Amendment, *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). Although the Sixth Amendment guarantees the right to be tried "by an impartial jury," U.S. Const. amend. VI, "the adequacy of *voir dire* is not easily subject to appellate review," *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "We review [a] district court's conduct of *voir dire* for abuse of discretion." *Butler v. City of Camden, City Hall*, 352 F.3d 811, 814 n.4 (3d Cir. 2003).

A district court's function during voir dire "is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez*, 451 U.S. at 188 (citations omitted). "In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses." *Id.* "Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*." *Id.* at 189.

Here, the District Court asked jurors about whether they could be fair and impartial in a case that involved child pornography, specifically informing them that they would be "shown child pornography including graphic images and hear descriptions of computer files and offensive file names which w[ould] certainly be disturbing to most if not all of [them]." (App. at 302-03.) After providing that warning, several potential jurors indicated that they may not be able to be fair and impartial, and those potential jurors were excused for cause.

Cunningham argues that the average person does not fully understand that child pornography may consist of videos of sexual abuse involving prepubescent children, and thus would not understand the nature of the child pornography in the video excerpts that were eventually shown at trial. To support that claim, Cunningham points to the fact that a few potential jurors were excused for cause during individual sidebar conferences only after receiving more detailed

43

descriptions of the videos that would be played at trial. We do not think that fact undermines the effectiveness of the voir dire, however. While more detail may have been useful, the District Court's decision to not provide more graphic information to the entire pool of potential jurors was not an abuse of discretion. Without minimizing the importance of removing the possibility of bias from a jury, we refrain from "second-guess[ing] the conclusions of the decision-maker," *Rosales-Lopez*, 451 U.S. at 189, especially in light of the clear instructions the District Court provided about the graphic nature of the child pornography to be shown. On remand, "accord[ing] ample discretion" to the District Court "in determining how best to conduct the *voir dire*," *id.* at 188, we leave it to that Court to determine if more detailed information about the case would be advisable to ensure a fair and impartial jury.

## III.    Conclusion

The District Court abused its discretion by failing to view the video excerpts before ruling them admissible. That lapse in proper procedure produced the substantive error of presenting to the jury evidence which bore the danger of unfair prejudice that substantially outweighed any probative value. Those errors were not harmless and we will therefore vacate the judgment of the District Court and remand for a new trial.[32] On remand, unless the Court determines that, considering the potential of unfair prejudice, the probative value of a proposed video excerpt is so minimal that it need

_____

[32] Given the District Court's July 31, 2012 order, *see* supra note 13, we will direct the Chief Judge of the District Court to reassign this matter.

44

not watch that excerpt, the Court must view the proposed video excerpts to not only assess their probative value and potential for unfair prejudicial impact but also to appropriately evaluate their admissibility in light of Rule 403's concern with redundancy.