PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2128
_____

UNITED STATES OF AMERICA

v.

KAREEM BAILEY, a/k/a Baby Boy

Kareem Bailey,
               Appellant
_____

No. 15-2246
_____

UNITED STATES OF AMERICA

v.

TERRY DAVIS, a/k/a Mace

Terry Davis,
               Appellant
_____

No. 15-2275
_____

UNITED STATES OF AMERICA

v.

LAMAR MACON, a/k/a Gunner,
a/k/a Gunna, a/k/a Mar

Lamar Macon,
               Appellant

_____

No. 15-2276
_____

UNITED STATES OF AMERICA

v.

DOMINIQUE VENABLE, a/k/a Poppi-What-You-Need

Dominique Venable,
                                        Appellant


Consolidated Appeals from the United States District Court
for the District of New Jersey
(D.N.J. Nos. 1-14-cr-00050-009, 1-14-cr-0050-008,
1-14-cr-00050-014 & 1-14-cr-00050-015).
District Court Judge: Honorable Joseph E. Irenas
_____

Argued: April 28, 2016

Before: McKEE, *Chief Judge*,[1] JORDAN and ROTH, *Circuit
Judge*s

(Filed: October 18, 2016)
_____

John M. Holliday      [Argued]
Golden Crest Corporate Center
2273 State Highway 33, Suite 207
Trenton, New Jersey 08690,
        *Counsel for Appellant Kareem Bailey in No. 15-2128*

_____

[1] Judge Theodore McKee concluded his term as Chief of the
United States Court of Appeals for the Third Circuit on September
30, 2016. Judge D. Brooks Smith became Chief Judge on October
1, 2016.

Gina A. Capuano      [Argued]
200 Haddon Ave.
Westmont, NJ 08180,
 *Counsel for Appellant Terry Davis in No. 15-2246*

William R. Spade, Jr.      [Argued]
1525 Locust Street, Suite 1400
Philadelphia, PA 19102,
 *Counsel for Appellant Lamar Macon in No. 15-2275*

James R. Murphy     [Argued]
947 Sate Road, Suite 205
Princeton, New Jersey 08540
 *Counsel for Appellant Dominique Venable in No. 15-2276*

Mark E. Coyne
Norman Gross      [Argued]
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ 08101
 *Counsel for Appellee*

_____

OPINION
_____

McKEE, *Chief Judge*.

This appeal arises from the convictions of four men belonging to a violent heroin trafficking organization that operated out of Atlantic City, New Jersey. Over the course of two and a half years, law enforcement officials documented the extensive reach of this organization and the crimes its members committed. Thirty-four people were charged with drug-trafficking related offenses as a result of the investigation. They include the four defendant/appellants here: Kareem Bailey, Terry Davis, Lamar Macon, and

3

Dominique Venable.[2] A jury convicted them of conspiracy to distribute and possess with intent to distribute heroin within 1,000 feet of a public housing complex, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1) & (b)(1)(A), and 21 U.S.C. § 860, use or possession of a firearm in furtherance of that drug trafficking offense, in violation of 21 U.S.C. § 924(c)(1)(A)(i), (ii), (iii) and 18 U.S.C. § 2, and use of a communication facility to further a drug conspiracy, in violation of 21 U.S.C. § 843(b). The jury also convicted Terry Davis of possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

On appeal, Bailey, Davis, Macon, and Venable make four principal arguments for reversal. They contend that: (1) the evidence presented at trial was insufficient to support their convictions; (2) the district court should have suppressed the government's wiretapping evidence; (3) the district court violated Federal Rules of Evidence 404(b) and 403 when it admitted certain evidence regarding a drug-trafficking-related murder and a drug-trafficking-related assault; and (4) the district court abused its discretion when it declined to order a mistrial on two different grounds. Bailey further contends that the district court abused its discretion in admitting evidence of his past convictions for possession of cocaine with intent to distribute and possession of a firearm. The defendants' first, second, and fourth arguments are entirely without merit. However, their Rule 403 claim merits serious consideration. As we will explain, we agree that the district court violated Rule 403 when it admitted certain evidence. Nonetheless, given the overwhelming amount of other evidence of guilt, we hold that the error was harmless. Accordingly, we will affirm the convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND
### A. *The Derry Drug Trafficking Organization*

Bailey, Davis, Macon, and Venable were associates in a violent heroin-trafficking organization that operated out of the Stanley Holmes Public Housing Village in Atlantic City, New Jersey. This organization was led by Mykal Derry and known as the Derry Drug Trafficking Organization (DDTO).

---

[2] For the sake of simplicity, we will refer to the defendants/appellants as either "defendant" or "defendants" throughout this opinion.

4

Derry purchased large quantities of heroin from three New Jersey suppliers and distributed the heroin in "bundles" (ten wax envelopes of heroin) and "bricks" (five bundles) to members of the DDTO. These DDTO associates then sold the heroin in and around the public housing complex. Investigators estimated that Derry received 717 bricks of heroin for distribution from October 2012 to February 2013. The DDTO maintained control of its drug-trafficking turf by assaulting, robbing, and killing rival drug dealers.

In July of 2010, the FBI began investigating the DDTO in conjunction with state and local law enforcement agencies. At first, confidential informants and undercover police officers made a series of controlled buys that were captured on audio and video recordings. By October, officers had identified Mykal Derry as the leader of the organization. For the next two years, police relied on confidential informants, controlled buys, physical surveillance, phone records, pen registers, and intercepted prison phone calls placed from the Atlantic County Jail to map the scope of the DDTO's operations.

However, the investigators eventually found these techniques inadequate to uncover the full reach of the conspiracy. In an attempt to remedy this, the government secured authorization for a wiretap from the United States District Court for the District of New Jersey in October 2012. Wiretaps on the phones of Mykal Derry and one of his suppliers, Tyrone Ellis, revealed many DDTO co-conspirators that police had previously been unaware of as well as new evidence regarding the organization's criminal activities. Overall, law enforcement intercepted and recorded approximately 6,700 pertinent calls over the course of their investigation.

In addition to these wiretaps, investigators obtained critical information from Kareem Young, a member of the DDTO. He eventually "flipped" and became a government informant. Prior to cooperating with the government, Young sold drugs for Derry, obtaining them directly from him. Young explained the inner workings of the DDTO to investigators, and he described the defendants' roles in the organization.

B. *District Court Proceedings*

A federal grand jury returned a fifteen-count indictment against fifteen defendants, including the four in

this consolidated appeal. Thereafter, the grand jury returned a 125-count superseding indictment against nineteen defendants, including these four defendants. The issues raised in this appeal pertain to the following charges in that indictment: (1) Conspiracy to Distribute and Possess with Intent to Distribute Heroin within 1000 Feet of a Public Housing Complex, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1) & (b)(1)(A), and 21 U.S.C. § 860 (drug conspiracy count); (2) Use or Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (firearm count); (3) Use of a Communication Facility to Further a Drug Conspiracy, in violation of 21 U.S.C. § 843(b) (phone count); and (4) Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1) (felon in possession count). While all four defendants were charged in the first three of those counts, only Terry Davis was charged in the fourth. The indictment alleged that the charged conspiracy lasted "[f]rom in or about October 2010 through in or about March 2013."[3]

Given logistical hurdles arising from the number of individuals indicted, the district court established three groups of defendants who would be tried separately. The four defendants here were among those joined in the first group to be tried. All four were subsequently convicted on all counts charged against them, except one phone count on which Bailey was acquitted. Davis received an aggregate sentence of 240 months' imprisonment in accordance with the applicable mandatory minimums. Venable was sentenced to 240 months; Bailey to 241 months; and Macon to 240 months.

Defendants now raise overlapping and individual challenges to their convictions. They raise four principal arguments. First, they contend that the government did not present sufficient evidence to support the jury's verdict. Second, Bailey, Venable, and Macon argue that the district court should have suppressed the evidence obtained through the wiretaps. Third, they claim that the district court violated Federal Rules of Evidence 404(b) and 403 when it permitted the government to present evidence of a murder committed by Mykal Derry's brother, Malik Derry. Bailey and Macon also argue that the district court violated Rule 403 when it

---

[3] Appendix for Kareem Bailey (Bailey J.A.) at 2.

permitted the government to present evidence of another drug-trafficking-related assault that DDTO members carried out. Bailey further appeals the district court's admission of his prior convictions under Rules 404(b) and 403. Fourth and finally, Venable, Bailey, and Macon claim there are three different grounds for a mistrial that were erroneously denied. For the reasons that follow, we hold that only one of the defendants' evidentiary challenges has any merit. Nonetheless, the resulting error was harmless.[4]

## II. SUFFICIENCY OF THE EVIDENCE CLAIM

A. *The Heroin-Trafficking Conspiracy Charge*

All four defendants contend that the evidence presented at trial was insufficient to support their convictions for membership in a heroin-trafficking conspiracy and use (or possession) of a firearm in furtherance of that drug trafficking conspiracy.[5] To prove they were members of a drug-trafficking conspiracy in violation of 21 U.S.C. § 846, the government must establish: (1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal.[6] We can infer such a conspiracy when evidence of related facts and circumstances make clear that the defendants could not have carried out their activities "'except as the result of a preconceived scheme or common understanding.'"[7] The government "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants."[8] Furthermore, the government is entitled to prove these elements entirely through circumstantial

---

[4] The district court had subject matter jurisdiction under 18 U.S.C. § 3231; we exercise jurisdiction pursuant to 28 U.S.C. § 1291.

[5] They do not challenge their convictions for use of a communication facility to further a drug conspiracy.

[6] *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999).

[7] *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) (quoting *United States v. Ellis*, 595 F.3d 154, 160 (3d Cir. 1979)).

[8] *United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002) (citing *United States v. Theodoropoulos*, 866 F.2d 587, 593 (3d Cir. 1989), *overruled on other grounds by United States v. Price*, 13 F.3d 711, 727 (3d Cir. 1994)).

evidence.[9] Indeed, "'[i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips.'"[10]

In drug conspiracy cases, the government must prove that the defendants were not merely engaged in "buyer-seller" relationships with their suppliers.[11] Instead, the government must prove that the defendants were actually members of the drug-trafficking conspiracy. We discussed the problem of differentiating between one who merely buys drugs from a drug conspiracy, and one who is an actual member of the conspiracy, in *United States v. Gibbs*.[12] *Gibbs* teaches that the factors that demonstrate a defendant was *part* of a conspiracy rather than in a mere buyer/seller relationship with that conspiracy include: (1) "the length of affiliation between the defendant and the conspiracy"; (2) "whether there is an established method of payment"; (3) "the extent to which transactions are standardized"; (4) "whether there is a demonstrated level of mutual trust"; (5) whether "transactions involved large amounts of drugs"; and (6) whether the defendant purchased his drugs on credit.[13] These factors do not necessarily establish membership in a conspiracy as opposed to a buyer-seller relationship, but "their presence suggests that a defendant has full knowledge of, if not a stake in, a conspiracy."[14] As we acknowledged in *Gibbs*:

> [W]hen a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he is dealing, is more likely to depend heavily on the conspiracy as the sole source of his drugs, and is more likely to perform drug-related acts for

---

[9] *Gibbs*, 190 F.3d at 197 (citing *United States v. McGlory*, 968 F.2d 309, 321 (3d Cir. 1992)).

[10] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (alteration in original) (quoting *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992)).

[11] *Gibbs*, 190 F.3d at 197.

[12] *Id.* at 188.

[13] *Id.* at 199.

[14] *Id.*

conspiracy members in an effort to maintain his connection to them.[15]

Of course, merely comprehending the nature of the group one purchases from does not change a person who is otherwise only a purchaser into a conspirator, and *Gibbs* does not hold otherwise.[16] Moreover, in *Gibbs*, Judge Becker also urged us to consider "whether the buyer can be said to have a stake in the larger conspiracy," beyond the buyer/seller relationship.[17]

Our standard of review in sufficiency of the evidence challenges is highly deferential.[18] A sufficiency challenge fails if, "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[19] In reviewing its sufficiency, the evidence is "view[ed] . . . as a whole,"[20] not piecemeal, and we do "'not weigh evidence or determine the credibility of witnesses.'"[21] Furthermore, when the facts support conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact

---

[15] *Id.*

[16] For example, one who regularly purchases his drugs from a drug cartel fully understands the overarching nature of the organization from which he purchases. However, that does not *ipso facto* transform that purchaser into a co-conspirator. There is clearly a distinction between knowing one is purchasing from a cartel and having a shared interest in the business of that cartel.

[17] *Id.* at 198, n.3.

[18] *United States v. Centeno*, 793 F.3d 378, 386 (3d Cir. 2015). Our review of sufficiency of the evidence challenges is plenary. *See United States v. Bornman*, 559 F.3d 150, 152 (3d Cir. 2009).

[19] *Caraballo-Rodriguez*, 726 F.3d at 424-25 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[20] *Centeno*, 793 F.3d at 386.

[21] *Id.* (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks omitted)).

9

resolved any such conflicts in favor of the prosecution, and must defer to that resolution."[22]

We further clarified the application of this deferential standard to drug conspiracy cases in a relatively recent *en banc* decision, *United States v. Caraballo-Rodriguez*.[23] There, we emphasized that in "a sufficiency of the evidence challenge in [a] drug conspiracy case[]," we are "not to act as a thirteenth juror."[24] We further admonished that "in this particular area—drug conspiracy cases—it appears that we [too frequently] examined sufficiency by looking at the evidence under a microscope."[25] Such inspection is not warranted: "Too often, we failed to ask whether any reasonable juror could conclude that the defendant knew the transaction involved drugs; instead, we reassessed the evidence independently."[26] In closing, we stressed:

> While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict— and not to usurp the role of the jury—as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges . . . . It is up to the jury— not the district court judge or our Court—to examine the evidence and draw inferences.[27]

The defendants must therefore clear a high hurdle to prevail on their challenge to the sufficiency of the evidence.

Here, there is considerable evidence that the DDTO was a drug trafficking organization, of which each of the defendants was a member. Kareem Young testified that Derry sold him and other DDTO associates bricks of heroin, some

---

[22] *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (internal quotation marks omitted).
[23] 726 F.3d 418 (3d Cir. 2013) (en banc).
[24] *Id.* at 431.
[25] *Id.*
[26] *Id.* at 432.
[27] *Id.*

of which Young paid for upon delivery and some of which he obtained on credit. Young explained that he and other DDTO associates stored heroin and guns inside trap houses that they operated at the Stanley Holmes Village apartments. He also stated that if a rival drug dealer attempted to sell heroin on DDTO "turf," DDTO associates would beat, rob, and/or shoot the invader.

Regarding the four defendants here, Young first testified that Derry provided heroin to Macon from 2011 through 2013, and Macon resold the heroin in Atlantic City on a daily basis. Young also stated that Derry sold Macon heroin on credit. Wiretapped phone calls between Macon and Derry corroborate this testimony. The wiretaps also captured a conversation between Derry and Macon in which Macon warned Derry about police surveillance. This fact suggests that Macon had a stake in the continued viability of Derry's drug operation. Similarly, police recorded Macon directing heroin customers to Derry. This evidence was more than sufficient to establish that Macon had an interest in the Derry conspiracy and, thus, was a member of it.

The evidence also established Davis was a member. In fact, Davis served as an "enforcer" for the group. Davis carried firearms to protect DDTO associates during heroin sales. Young testified that Derry delivered heroin to Davis for redistribution, occasionally providing it on credit. Intercepted conversations corroborated Young's testimony against Davis. The prosecution also presented other examples of Davis's active membership in the DDTO. These examples included recorded conversations about an incident in which Davis rented a hide-away room at the Trump Taj Mahal Casino for Derry after Derry and his brother Malik murdered a member of a rival gang. This evidence was enough to allow a reasonable jury to conclude that Derry and Davis had a shared interest in the success of the DDTO.

Venable's attempt to distance himself from membership in the DDTO fares no better. Young recounted that Derry sold heroin to Venable in 2011 and 2012, occasionally providing it to him on credit. Moreover, Venable conceded in his brief that "direct proof . . . of Venable's membership in the conspiracy"[28] came from Young. The

---

[28] Venable Br. at 23.

government also corroborated Young's testimony with intercepted phone conversations, including one in which Derry instructed Venable to go to the bathroom of a McDonald's restaurant in Atlantic City and sell heroin to a customer there. Like Macon, Venable referred heroin customers to Derry so that Derry could make the sale himself.

The government also presented sufficient evidence of Bailey's membership in the DDTO drug conspiracy. Recorded calls revealed Bailey setting up sales for Derry. Bailey, like Macon, also acted as a lookout for the DDTO. Lastly, the evidence included recorded conversations between Derry and Bailey in which the two discussed collecting money from other DDTO associates so that they could post bail for Davis and another DDTO co-conspirator.

This evidence establishes several important *Gibbs* factors. First, as *Gibbs* teaches, "[a] large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities."[29]

The fact that Macon and Davis obtained heroin from Derry on credit with some regularity further shows the trusting and continuing nature of the relationship between them. This trust is indicative of membership in a conspiracy rather than merely purchasing from it.

> A credit relationship may well reflect the kind of trust that is referenced *supra*, and often evidences the parties' mutual stake in each other's transactions. By extending credit to a buyer, the seller risks the possibility that the buyer will be unable to resell the drugs: even if the buyer does successfully resell the drugs, in this generally thinly capitalized "business," the seller will likely have to wait until the buyer collects the money from his resale before he can pay the seller back for the initial purchase. In addition, the buyer has a vested interest in the seller's ability to maintain a good working relationship with his supplier, since the buyer

---

[29] *United States v. Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999).

will not profit unless the drugs continue to flow from the seller's supplier to the seller.[30]

The fact that Bailey, Macon, and Davis occasionally advanced the DDTO by serving as lookouts are also indicative of membership in the conspiracy. We have explained that when a defendant "acted as a lookout [while an alleged coconspirator] conducted drug sales, [] that fact alone may well have been enough to show the existence of a conspiracy between" those persons.[31]

Accordingly, it is abundantly clear that all four of these defendants had a stake in the DDTO organization and actively worked to advance the goals of that organization; these were goals from which each of these defendants shared and benefitted. This evidence is clearly sufficient to establish each of the defendants' membership in the charged conspiracy beyond a reasonable doubt, and their protestations to the contrary are unpersuasive.[32]

B. *The Firearm Possession Charge*

The defendants further claim that the evidence was insufficient to prove that they possessed, carried, or used firearms in furtherance of the heroin-trafficking conspiracy. This argument is only slightly better than their claim that the evidence was not sufficient to establish their membership in the DDTO conspiracy. To prove the firearms charge, the government had to prove that:

> (1) the defendant committed either the crime of conspiracy to distribute and possess with intent to distribute a controlled substance or the crime of possession with intent to distribute; (2) the defendant knowingly possessed a firearm; and (3) the defendant knowingly possessed the firearm in furtherance of the crime of

---

[30] *Id.* at 200.

[31] *United States v. Pressler*, 256 F.3d 144, 155 (3d Cir. 2001).

[32] The fact that much of the evidence of the defendants' participation in the conspiracy came from one co-conspirator does not undermine our conclusion. *See United States v. Boria*, 592 F.3d 476 (3d Cir. 2010).

conspiracy to distribute or in furtherance of the crime of possession with intent to distribute.[33]

However, since the government charged a conspiracy, it need not prove that each defendant himself personally used a firearm in furtherance of the conspiracy. Instead, under *Pinkerton v. United States*,[34] each member of the charged conspiracy is liable for the substantive crimes his co-conspirators commit in furtherance of the conspiracy even if he neither participates in his co-conspirators' crimes nor has any knowledge of them, absent the following three exceptions to that rule.[35] A defendant may not be held liable for the offenses of his co-conspirators if: (1) "the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy,"[36] (2) the substantive offense committed by one of the conspirators "did not fall within the scope of the unlawful project,"[37] or (3) the substantive offense committed by one of the conspirators "could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."[38]

Here, the government introduced considerable evidence of the DDTO's profligate use of firearms to further the common interests of the conspirators. Young testified that the DDTO associates engaged in numerous shootings, targeting rival drug dealers and former DDTO associates in an effort to maintain DDTO control over the drug-trafficking trade in the Stanley Holmes area. For example, Young explained that Derry and another DDTO associate assaulted a former DDTO associate named Anthony Rosario after Rosario stopped buying heroin from Derry. After Rosario reported the assault to the police, Derry ordered his cousin to shoot Rosario.

The government introduced evidence that Macon, Davis, Venable, and Bailey either committed the substantive

---

[33] *United States v. Bobb*, 471 F.3d 491, 496 (3d Cir. 2006).

[34] 328 U.S. 640 (1946).

[35] *United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990) (citing *Pinkerton*).

[36] *Pinkerton*, 328 U.S. at 647.

[37] *Id.* at 647-48.

[38] *Id.* at 648.

crime of possession in furtherance of a drug-trafficking conspiracy or else met *Pinkerton*'s standard for co-conspirator liability. As previously explained, "As long as [a conspirator's] action was within the purview of the conspiracy, his co-conspirators are as liable for his gun as if they had carried the firearm themselves."[39]

Young told the jury that when he and Macon were selling heroin one night in the Stanley Holmes Village, Macon asked Young if he was "strapped" (*i.e.* armed), and Young assured Macon that he was. Macon also spent time in DDTO trap houses where firearms were openly displayed.

Young further explained that he repeatedly saw Davis carrying guns, and that Davis was an "enforcer" for the DDTO. Law enforcement also intercepted conversations between Davis and another DDTO associate regarding a shooting that a DDTO associate carried out against rival drug dealers.

According to Young, Venable regularly carried a loaded .22 caliber rifle with a sawed-off barrel to shoot at rival drug dealers. The police seized a sawed-off, .22 caliber rifle from Venable, thus corroborating Young's testimony. Moreover, Young testified that Venable admitted that he was involved in a shooting on rival drug turf. The presence of a discharged .22 caliber shell casing found at the scene of the shooting corroborated this testimony.

Young testified that Bailey possessed "firearms at times while he was selling drugs or engaged in the business of selling drugs in and around" the Stanley Holmes Village and other locations. After Bailey was arrested, Derry told Bailey that he was glad that Bailey "wasn't strapped" when he was arrested, and Bailey acknowledged his ownership of a gun ("my joint").

---

[39] *United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990) (stating that the evidence was sufficient to prove that a coconspirator's "use of his weapon was both foreseeable to . . . [his co-conspirator] . . . and within the scope of the conspiracy"); *see United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997) ("[T]here was sufficient evidence that Casiano could have reasonably foreseen the use of a gun by his co-conspirators."); *United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998) (same).

This evidence is sufficient to establish actual possession of firearms in furtherance of drug-trafficking activity. It is also more than enough proof that each defendant conspired to possess them for that purpose. There was also evidence that Davis, Venable, and Bailey carried firearms during drug sales, supporting the inference that they relied on these firearms to enforce and protect their drug business. Venable even appears to have used his firearm in drug-related shootings.

Even without this direct evidence, the government produced sufficient evidence to prove that all four defendants knew the DDTO used guns in furtherance of the drug conspiracy. All four were aware of numerous drug-related DDTO shootings, saw firearms in trap houses, and knew that the DDTO used armed, *i.e.* "strapped," enforcers.

## III. THE WIRETAP EVIDENCE CHALLENGE

Bailey, Macon, and Venable claim that the government failed to establish "necessity" for its wiretaps. Thus, they contend that the district court erred in not suppressing the evidentiary "fruits" of those wiretaps. According to the defendants, the investigators obtained sufficient information through "traditional investigative techniques," such as controlled purchases of heroin, physical surveillance, review of telephone records, and confidential informants. The record is to the contrary.

The team that investigated this case used nearly every technique in the book before requesting authorization for a wiretap. They ultimately applied for a wiretap only when it became clear that the less invasive techniques they had been using were not effective. Those methods did not disclose the full scope of the DDTO's conspiracy. We review the district court's approval of the wiretap application for clear error, while exercising plenary review over its legal determinations.[40]

The statute governing the authorization of wiretaps, Title III,[41] requires the government to demonstrate necessity when applying for wiretap authorization. More specifically, wiretap applications must contain "a full and complete

---

[40] *United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014).

[41] 18 U.S.C. § 2518.

statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[42] The purpose of the necessity requirement is "to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications."[43] The Supreme Court has emphasized that "[t]hese procedures [are] not to be routinely employed as the initial step in criminal investigation."[44]

A district court may approve a wiretap application when the government demonstrates that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[45] We have acknowledged that "18 U.S.C. § 2518(3)(c) does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance."[46] "The government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient."[47] Ultimately, we apply the necessity requirement in a "practical and common sense fashion."[48]

---

[42] 18 U.S.C. § 2518(1)(c).

[43] *United States v. Giordano*, 416 U.S. 505, 515 (1974).

[44] *Id.*

[45] 18 U.S.C. § 2518(3)(c).

[46] *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997); *see also United States v. Galloway*, 749 F.3d 238, 243 (4th Cir. 2014) (observing that necessity was shown where the affidavit described "at length the steps that police officers had taken . . . in investigating" a drug-trafficking conspiracy, "addressing at least ten alternative investigatory procedures," included "physical surveillance, analyzing telephone toll records, and affixing GPS devices"; "those methods had failed to reveal the full scope of the organization, showing instead that members of this organization [were] extremely cautious in their movements and activities" (alternation in original) (internal quotation marks omitted)).

[47] *Id.* (internal quotation marks omitted).

[48] *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975) (internal quotation marks omitted).

Here, law enforcement either exhausted the normal investigative techniques available to them or else reasonably concluded that such procedures were unlikely to succeed if tried. The affidavit in support of the wiretaps lays this out in exhaustive detail. The investigators first recruited confidential informants who made controlled purchases of heroin from Derry and other DDTO associates. Investigators used physical surveillance of most of the controlled purchases of heroin from Derry. Investigators also obtained information from recorded prison telephones involving incarcerated DDTO associates.

These techniques proved to be insufficient. The confidential informants bought heroin almost exclusively from Derry and did not "know all" of his confederates. They also could not ascertain the DDTO's "method(s) or source(s) of supply, nor locations used for storage, packaging or distribution."[49] Investigators "believed that if [Derry] was arrested for" selling heroin, the DDTO "would continue to distribute narcotics, and continue to engage in violence."[50] Thus, arresting Derry alone would have frustrated the goals of the broader investigation.

Law enforcement further determined that other, less invasive investigative techniques would also fail to reveal the full scope of the DDTO's operations. Continued physical surveillance was likely to be fruitless because most of the associates were surveillance conscious, avoiding locations that were visible to security cameras. They were also occasionally aware of surveillance vehicles when they were present (some of these defendants even alerted each other to the presence of surveillance vehicles). Investigators also determined that searches of the targets' trash would provide little relevant evidence because trash at the Stanley Holmes Village was thrown into communal dumpsters and could not be attributed to particular tenants.

Law enforcement also decided that the execution of search warrants would be futile because such searches would alert DDTO associates to the existence of the investigation, thereby leading to the concealment or destruction of evidence before police could identify all drug stash locations.

---

[49] Supplemental Appendix 694 (Affidavit ¶ 92).
[50] Supplemental Appendix 698 (Affidavit ¶ 102).

Additionally, execution of search warrants "in and of themselves, would [not] meet the goals and objectives of this investigation" because the "[e]vidence seized would only implicate the individual directly associated with the respective property[] and not the entire organization."[51] And perhaps most importantly, the investigators determined that DDTO associates were unlikely to cooperate with law enforcement officials due, in large part, to the threat of retribution.

As the government explained in its affidavit, Derry largely conducted his business over cell phones, using seven different mobile telephones an average of 205 times per day. In a final attempt to avoid applying for wiretap authorization, investigators first obtained judicial approval to install pen registers and trap-and-trace devices as well as collect global positioning satellite information on Derry's mobile telephones. These devices enabled officers to track Derry's location and contacts without allowing them to listen to the substance of his calls. However, police were still unable to ascertain the identities of the people speaking to Derry on the phone. It was therefore necessary for the government to obtain more precise information regarding Derry's cell phone use.

Moreover, as the government explains in its brief, the "value of historical telephone usage information was limited by the fact that targets occasionally used 'pre-paid' telephones or 'drop phones'—for which service providers were not required to maintain subscriber information—or used fictitious names to subscribe for telephone service."[52] Furthermore, although the GPS data informed police when targets were at particular locations, investigators could not prove they were engaged in criminal activity. Thus, over two years into the investigation, law enforcement applied for and received wiretap authorization. The government's wiretap affidavit detailed each of the investigative steps law enforcement had previously attempted and explained with precision why other techniques would prove fruitless.

---

[51] Supplemental Appendix 702 (Affidavit ¶ 114).

[52] Gov't Br. at 53 (citing Supplemental Appendix 710-11 (Affidavit ¶¶ 130, 132)).

Far from being inadequate to justify authorization of a wiretap, the government's application here is a textbook model of care and thoroughness, and the individuals who prepared it are to be commended. With meticulous and painstaking care, they clearly explained the government's need for the wiretap authorization and why, absent that information, the government would only be able to arrest Derry and a few other key DDTO associates. As we have previously explained, even where "normal investigative techniques might have been sufficient to implicate" the conspiracy leader in drug trafficking, "such approaches" are sometimes insufficient to determine "the scope of the conspiracy or the nature of [the conspiracy leader's] on-going criminal activity."[53] Investigations are not limited "to crimes which can be probed satisfactorily by normal methods."[54] Instead, "[i]n the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies."[55]

In *United States v. Armocida*,[56] we explained that "[a]lthough the government ha[d] actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it [would have been] unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network [was] uncovered and the identity of its participants learned."[57] The same is true here. The government established that a wiretap was necessary to uncover the full scope of the DDTO's operation, despite the fact that law enforcement had enough evidence without it to arrest Mykal Derry.

Moreover, as previously explained, the government was not required to show that all other investigative methods would have been ineffective (even though the government appears to have made such a showing here). "It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of

---

[53] *United States v. Vento*, 533 F.2d 838, 850 (3d Cir. 1976).

[54] *Id.*

[55] *Id.*

[56] 515 F.2d 29 (3d Cir. 1975).

[57] *Id.* at 38.

investigation."[58] As long as the wiretap affidavit is prepared in detail, recounting the investigative methods that were attempted and why other methods would prove ineffective, as they were here, we have no difficulty concluding that the district court did not abuse its discretion in determining that the affidavit supported a finding of necessity.

## IV. RULE 403 AND 404(B) CLAIMS

A. *Evidence of the James Murder*

The district court permitted the government to present evidence that Mykal Derry and his brother Malik murdered a rival heroin trafficker named Tyquinn James for selling drugs on their turf. The evidence was admitted to prove the firearm and drug trafficking conspiracy charges.

On February 10, 2013, Malik Derry shot Tyquinn James at extremely close range outside a populated fast food restaurant and liquor store in Atlantic City. A security camera outside the restaurant partially captured the murder on video. At trial, the district court permitted the government to present both the video recording of this murder as well as non-video evidence—testimony and recorded conversations—discussing the murder. Davis, Bailey, Macon, and Venable argue that the district court erred in admitting both the video and non-video evidence of the James murder under Federal Rule of Evidence 403. Davis also argues that the evidence was inadmissible under Federal Rule of Evidence 404(b).

We conclude that the district court did not err in admitting the non-video evidence of the James murder. Given the nature of the charged conspiracy, that evidence was more probative than prejudicial and therefore admissible under Rule 403. However, we are extremely troubled by the district court's decision to allow the surveillance video of that shooting into evidence. The video depicted a brutal murder; it was not necessary to establish the government's stated purpose in seeking its admission, and the probative value of this video—if any—was vastly outweighed by the significant risk of undue prejudice and emotion it most likely stimulated in the jury. As we shall explain, the district court should not have admitted this tape into evidence. Nevertheless, even though we are disturbed by this error and the prosecution's tactic, given the plethora of evidence of guilt of each of these

---

[58] *Vento*, 533 F.2d at 849.

defendants, we hold that this error was harmless. We address each of these issues in turn, beginning with the non-video evidence.

1. <u>The Non-Video James Murder Evidence</u>

i. Standard of Review

We generally review a district court's evidentiary findings for abuse of discretion.[59] This standard requires us to afford district courts "broad discretion on evidentiary rulings" due to their "familiarity with the details" of the cases in front of them and their "greater experience in evidentiary matters."[60] "In order to justify reversal, a district court's analysis and resulting conclusion must be arbitrary or irrational."[61] Nevertheless, when reviewing a district court's admission of evidence under Federal Rule of Evidence 403, we do not afford that court the deference normally afforded when we review for abuse of discretion if the district court failed to engage in on-the-record balancing.

Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[62] When determining whether evidence violates Rule 403, district courts must balance the probative value of the evidence against its prejudicial effect, clarifying its reasoning on-the-record.[63] This requirement not only provides

---

[59] *United States v. Schneider*, 801 F.3d 186, 197 (3d Cir. 2015).

[60] *United States v. Finley*, 726 F.3d 483, 491 (3d Cir. 2013) (internal quotation marks omitted).

[61] *Schneider*, 801 F.3d at 198 (internal alternations omitted) (internal quotation marks omitted).

[62] Fed. R. Evid. 403.

[63] *See United States v. Caldwell*, 760 F.3d 267, 283-84 (3d Cir. 2014), *reh'g denied* (Sept. 16, 2014); *United States v. Smith*, 725 F.3d 340, 348 (3d Cir. 2013) (explaining that the district court's balancing must be apparent from the record); *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992) ("When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling. Where, however, the court failed to perform

the defendants with an explanation of the district court's reasoning, but also enables appellate courts to understand the district court's logic. If a district court does not conduct this on-the-record balancing, we either remand the case to the district court or, where practical, undertake this balancing ourselves.[64]

Here, Davis contends that the district court abused its discretion because it failed to conduct the requisite on-the-record balancing with respect to the video evidence of the James murder. Although Davis does not raise this argument with respect to the non-video evidence, we will address this point with respect to all evidence of the James murder as it dictates the degree of deference we must afford the district court's decision. We conclude that the district court articulated sufficient reasons, on-the-record, for admitting the non-video evidence of the James murder.

At trial, both parties briefed the Rule 403 issue with respect to both testimonial and video evidence, and the

this analysis, or where its rationale is not apparent from the record, there is no way to review its discretion." (internal citation omitted)).

[64] *See United States v. Cunningham*, 694 F.3d 372, 388-91 (3d Cir. 2012) (holding that the district court's "underlying Rule 403 determination [was] not entitled to the full range of deference that we would normally give to it on appeal," and then conducting our own Rule 403 analysis); *United States v. Murray*, 103 F.3d 310, 318-19 (3d Cir. 1997) ("When the record does not contain an adequate explanation of a trial judge's Rule 403 ruling, a remand for clarification may be appropriate, but here we see no reason for a remand, because we see no basis on which the admission of the evidence in question could be sustained."). When a district court fails to conduct the appropriate balancing, that omission does not *per se* necessitate reversal and remand. *See United States v. Eufrasio*, 935 F.2d 553, 572 (3d Cir. 1991) ("Either way, the trial court's failure to expressly articulate a Rule 403 balance when faced with a Rule 403 objection, would not be reversible error *per se*."). Our Court can conduct the necessary balancing if the record provides the information needed for that determination. *See Cunningham*, 694 F.3d at 388-91.

district court heard argument on the issues. The court then conducted the necessary balancing with respect to the non-video evidence. First, the district court acknowledged that the evidence was prejudicial, but only in the way that all probative evidence is prejudicial. The court then rejected the defendants' argument that the non-video evidence of the James murder was cumulative of other documentation of the DDTO's drug-related violence. The court reasoned that nothing about this evidence was *unfairly* prejudicial and rejected the defendants' Rule 403 argument. The district court considered a number of relevant factors in conducting its on-the-record balancing. The balancing inquiry convinced the court that the testimonial and wiretapping evidence of the James murder should be admitted. Accordingly, we review that decision only for an abuse of discretion. We must therefore determine whether "'the district court's action was arbitrary, fanciful or clearly unreasonable,' and 'we will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view.'"[65]

ii. Admissibility of the Non-Video Evidence under Rule 403

We now turn to the merits of the district court's Rule 403 ruling as to the non-video evidence of the James murder. As previously stated, under Rule 403, a court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[66] "When weighing the Rule 403 factors, courts 'must appraise the genuine need for the challenged evidence and balance that necessity against the

---

[65] *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (internal alterations omitted) (quoting *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 519 (3d Cir. 2003)).

[66] Fed. R. Evid. 403; *see United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 664 (3d Cir. 2000) (en banc) ("As the text of [Rule 403] indicates, evidence that is otherwise relevant and admissible may only be excluded if the probative value of the evidence is substantially outweighed by its prejudicial effect.").

risk of prejudice to the defendant.'"[67] "Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value."[68] Moreover, when evidence is highly probative, "even a large risk of unfair prejudice may be tolerable."[69] The converse is also true. When the probative value of evidence is tenuous, a relatively minor risk of substantial undue prejudice should counsel against admitting it.

The evidence of the James murder was highly probative to the firearms charge. As previously explained, the government had to prove either that each defendant conspired to traffic heroin and knowingly possessed firearms in furtherance of that conspiracy[70] or that their co-conspirators' use of firearms in furtherance of the conspiracy was foreseeable under *Pinkerton*.[71] At trial, the government argued that Derry and his brother killed James to eliminate competition with their drug-trafficking conspiracy. The government also proved that some of these defendants helped Derry hide from the authorities after the shooting. Accordingly, evidence of this murder—and the defendants' knowledge of it—was very relevant to establishing whether use or possession of firearms in furtherance of the DDTO was reasonably foreseeable. Testimony about the murder was also highly probative of the defendants' guilt of the charged firearm offense.[72] Indeed, counsel for one of the defendants even conceded this fact in his brief.

---

[67] *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014) (quoting *Gov't of Virgin Islands v. Archibald*, 987 F.2d 180, 186 (3d Cir. 1993) (internal quotation marks omitted)).

[68] *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002) (quoting Fed. R. Evid. 403); *see Claxton*, 766 F.3d at 302 (quoting *Cross*).

[69] *Cross*, 308 F.3d at 323; *see Claxton*, 766 F.3d at 302 (quoting *Cross*).

[70] *United States v. Bobb*, 471 F.3d 491, 496 (3d Cir. 2006).

[71] *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946).

[72] *See United States v. Jones*, 566 F.3d 353, 365 n.5 (3d Cir. 2009) (holding that evidence of gang related shootings was relevant to the charged conspiracy because they "tended to

25

The defendants nonetheless argue that the danger of unfair prejudice associated with this evidence outweighed its probative value. They point out that they offered a trial stipulation that DDTO associates murdered James. However, we have repeatedly acknowledged the Supreme Court's canonical directive in *Old Chief v. United States.*[73] There, the Court explained that the government is "entitled to prove its case free from any defendant's option to stipulate the evidence away."[74] "That rule 'rests on good sense' because '[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it.'"[75]

> Moreover, if the government uses testimony or other tangible evidence to describe a series of events, but then interrupts that pattern by "announcing a stipulation or admission, the effect may be like saying, 'never mind what's behind the door,' and jurors may well wonder what they are being kept from knowing," or whether the government is "responsible for cloaking something."[76]

Thus, the government was entitled to present evidence of the James murder to the jury through testimony, rather than by stipulation.

Defendants also argue that evidence of the James murder was cumulative because evidence pertaining to other DDTO shootings was presented at trial. But *Old Chief* also teaches that "the mere fact that two pieces of evidence might

---

show the gang's hierarchal structure and expectations that lower-ranking members, . . . carry out the violent acts of retaliation, including murder, against other gangs to ensure one's position within the Bloods, solidify its violent reputation, and protect its drug-distribution territory from rival gangs, among other things").

[73] 519 U.S. 172, 189 (1997).

[74] *Id.*; *see United States v. Cunningham*, 694 F.3d 372, 387-88 (3d Cir. 2012).

[75] *Cunningham*, 694 F.3d at 387 (quoting *Old Chief*, 519 U.S. at 189).

[76] *Id.* at 388 (quoting *Old Chief*, 519 U.S. at 189).

go to the same point would not . . . necessarily mean that only one of them might come in."[77] The fact that the government placed into evidence other examples of the DDTO's violent offenses is certainly relevant to the Rule 403 balancing. However, such evidentiary submissions did not automatically foreclose the prosecution from eliciting testimony about the James murder. To counsel's credit, Davis actually concedes this point.

The government stipulated to the fact that none of the defendants here actually murdered or plotted to murder James. Indeed, the government took pains to prove that Derry and his brother committed this murder. As we explained in *United States v. Jones*,[78] such a stipulation mitigates the danger of unfair prejudice. In *Jones*, the government tried a gang member for conspiracy to commit murder and attempted murder. There, as here, the government introduced evidence that other gang members—not on trial—committed violent acts, including shootings.[79] The defendant argued that evidence of other gang members' violent crimes was more prejudicial than probative.[80] In rejecting the defendant's claim, we emphasized that there had not been any suggestion that the defendant had actually committed these crimes.[81] The same is true here. Not only was there no suggestion that any of these defendants were implicated in the James murder, but also there was a stipulation to the contrary. Accordingly, we cannot conclude that the district court abused its discretion in admitting the testimonial evidence of the James murder pursuant to Rule 403.

2. The Video Evidence of the James Murder

i. Standard of Review

In contrast to its treatment of the non-video evidence, the district court failed to conduct the requisite Rule 403 on-the-record balancing with respect to the video of the James murder. Had it done so, it is difficult to see how it could have concluded that the probative value of this video outweighed its prejudicial impact.

---

[77] *Old Chief*, 519 U.S. at 183.

[78] 566 F.3d 353, 363-65 (3d Cir. 2009).

[79] *Id.* at 364-65.

[80] *Id.*

[81] *Id.* at 365.

The extent of the district court's balancing regarding this piece of evidence was an off-handed and rather casual remark that the video of James being shot in the head at point blank range "wasn't very graphic."[82] With that comment, the district court concluded that the video evidence would be admitted. For reasons known only to the court, the judge added that the admission of this evidence would give the defendants "an appeal issue."[83] The court was right.

We have stated numerous times that a district court must provide a statement of reasons, on-the-record, explaining why it is admitting evidence over a Rule 403 objection. In *United States v. Caldwell*,[84] we explained that district courts must engage in "more than a bare recitation of Rule 403."[85] In *Caldwell*, the district court admitted evidence under Rule 403 after simply stating that the evidence in question was "more probative than prejudicial," and accordingly its "probative value outweighs any prejudicial effect."[86] As we explained there, such a mantra-like recitation of the rule is no substitute for a specific explanation of *why* the evidence is admissible. "[W]e cannot infer such a 'rational explanation' where the court merely recites the text of the rule."[87]

Here, the district court failed to discuss the probative value of this evidence or even acknowledge the video's potential for prejudice. Instead, the district court merely

---

[82] It may be that what is "graphic" is in the eye and furtive imagination of the beholder. This video was in black and white, and the resolution did not approach a high definition color video. However, an image of a person being gunned down on a sidewalk does not have to be shot in high definition, 3D, or virtual reality to be graphic. The absence of color and blood only slightly mitigates the gruesome nature of a life being instantly snuffed out on the sidewalk.

[83] "Why don't you let it in so you have an appeal issue[?]" Bailey J.A. 2083.

[84] 760 F.3d 267, 284 (3d Cir. 2014), *reh'g denied* (Sept. 16, 2014).

[85] *Id.*

[86] *Id.* (quoting the district court below).

[87] *Id.* (quoting *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992)).

recited the text of Rule 403 and concluded that the evidence was admissible—exactly what *Caldwell* prohibits. Because the district court's "rationale is not apparent from the record," we have "no way to review its discretion."[88] Therefore, we will not afford the district court's decision the deference of abuse of discretion review.

ii. Admissibility of the Video Evidence under Rule 403

In contrast to the non-video evidence, it is clear that the district court should not have admitted the video of the James murder. This video had a substantially greater risk of unfair prejudice than the testimonial and wiretap evidence because it graphically depicts what can only be described as a cold-blooded murder. The video shows James standing in front of a populated restaurant as Malik Derry rides up on a bicycle, draws his gun, and shoots James in the head at point blank range. Malik then casually rides away as James crumples and collapses to the ground. A child leaves the restaurant, staring at James' body, as another passerby appears to call the police. Although no blood is visible in the video, it is nonetheless highly disturbing. As the government repeatedly emphasized in oral argument, the video depicts a ruthless murder, carried out by someone with no regard for human life. It is difficult to understand how the emotional impact of this video would not unfairly prejudice the jury against members of the DDTO.

Nonetheless, as we just explained, we will not disturb the district court's determination unless the danger of unfair prejudice *substantially outweighs* the probative value of evidence. We have little trouble concluding that it does. The government introduced abundant evidence to prove the James murder and its relationship to the charged drug conspiracy via recorded telephone conversations and testimony at trial. This video was not merely cumulative, it was a graphic depiction of an event that had already been thoroughly proven. This court[89] and other circuit courts[90] have clarified that probative

---

[88] *Sampson*, 980 F.2d at 889.

[89] *See Cunningham*, 694 F.3d at 389-91.

[90] *See United States v. Wiggan*, 700 F.3d 1204, 1214 (9th Cir. 2012) (excluding evidence under Rule 403 where much of that evidence "was available in other forms—by alternative

value is "informed by the availability of alternative means to present similar evidence."[91] In *Old Chief*, the Supreme Court advised that the "Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives."[92] As the Seventh and Ninth Circuits have recognized, "[t]here may be cases where the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice to the defendant substantially outweighs any probative value the evidence might have."[93] This appeal presents such a case. The government had alternate, less prejudicial ways of presenting the James murder. This other evidence substantially reduced the probative value of the James video.

We explained this concept in *United States v. Cunningham*.[94] That case involved the admission of cumulative evidence in the form of videos. The videos at issue depicted pre-pubescent children being bound, raped, and violently assaulted.[95] The district court admitted two videos composed of seven shorter clips as proof of the child pornography charges, holding that these videos were more

---

means—without risking the dangers of unfairness that use of a grand juror's testimony would present"); *United States v. Awadallah*, 436 F.3d 125, 132 (2d Cir. 2006) (noting that probative value is "informed by the availability of alternative means to present similar evidence"); *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir. 1983) (explaining that a factor to be taken into consideration in measuring admissibility of potentially prejudicial evidence is whether the same fact could have been proven by other evidence).

[91] *Awadallah*, 436 F.3d at 132.

[92] *Old Chief v. United States*, 519 U.S. 172, 184 (1997).

[93] *United States v. Loughry*, 660 F.3d 965, 971 (7th Cir. 2011) (citing *United States v. Gonzalez–Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." (internal quotation marks omitted))).

[94] 694 F.3d 372 (3d Cir. 2012).

[95] *Id.* at 381-82, 390.

probative than prejudicial under Rule 403.[96] Critically, the district court admitted these videos despite the availability of alternative means to prove the charged offense, including "witness testimony, still images, shorter video clips, [his] proffered stipulations, and/or the actual stipulations."[97] In reversing, we explained:

> Even though the two sets of videos were probative, [] the law of diminishing marginal returns still operates. The probative value of each clip was reduced by the existence of the clips before it. . . . As a result, after one excerpt from each video was displayed, the probative value of the remaining excerpts became diminished because knowledge . . . had already been established . . . by the prior video excerpts. Thus, any of the three excerpts from the first video would have diminished probative value if one or two of the other video excerpts from the first video had already been shown. Likewise, any of the four excerpts from the second video would have diminished probative value if one or two of the other video excerpts from the second video had already been shown. [98]

We held that the video excerpts should have been excluded because their "aggregate risk of unfair prejudice was tremendous" while their probative value was low given the availability of other evidence.[99] Although "a district court 'is not required to scrub the trial clean of all evidence that may have an emotional impact,'"[100] *Cunningham* nonetheless stands for the principle that this emotional impact outweighs the probative value of evidence that is entirely redundant. "[T]he more video excerpts were shown, the more it became a

---

[96] *Id.* at 380.

[97] *Id.* at 387 (internal quotation marks omitted).

[98] *Id.* at 389-90.

[99] *Id.* at 390.

[100] *Id.* at 391 (quoting *United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008)).

needless presentation of unfairly prejudicial and cumulative evidence."[101]

Here, the James video was entirely redundant. Its *only* value lay in its emotional impact.[102] The video had no probative value apart from its capacity to prejudice the jury against the defendants. When asked at oral argument what the value of the video was apart from its prejudicial shock value, the government repeatedly responded that the value of the video *was* its shock value:

> **The Court**: How does the fact that you see the guy get it in the head and drop like a rock tell you it's this conspiracy?
> **The Government**: Well it's this conspiracy because, there is other evidence that shows that it's this conspiracy.
> **The Court**: Precisely. . . . Why did you need the video? What did the video get you except for the emotional wallop of seeing a guy go down with a bullet going through his head?
> **The Government:** What the video got, your honor, is it showed how the murder was committed in a way that no other evidence did. It shows that it was committed brazenly, when other people were standing around in a public area. . . . Malik Derry rides up and brazenly guns him down.[103]

In other words, the government argued that the video allowed it to elicit the emotion that Rule 403 is designed to prevent. As in *Cunningham*, "[w]e disagree with the government's contention . . . that [the] video [] needed to be shown to 'fully appreciate the nature of [the] crimes.'"[104] Given the availability of other evidence of the *exact* same

---

[101] *Id.*

[102] We, of course, are not suggesting that the video would have been properly admissible had the government refrained from introducing the recorded conversations about the murder or soliciting testimony about it from witnesses so that it could argue for admission of the more graphic video.

[103] Oral Argument at 33:00 minutes.

[104] *Cunningham*, 694 F.3d at 391.

crime, the government did not need the James video to prove the firearm or conspiracy charges.

It is hard to understand how the district court could have concluded that the relatively insignificant probative value of that video was not outweighed by its substantial prejudicial effect. Although the Supreme Court's proscription in *United States v. Berger*[105] is oft repeated, it seems all too often to resemble the falling tree that no one hears. In *Berger*, the Court unequivocally stated: "[The prosecutor] is in a peculiar and very definite sense the servant of the law. . . . He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."[106] In other words, although ours is an adversarial system, prosecutors should never allow their overarching objective to be victory. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."[107] As the Supreme Court has warned, the integrity of the criminal justice system is jeopardized when prosecutors adopt tactics which are governed by the sadly mistaken and dangerous principle that victory is the primary objective of a criminal prosecution.

iii. Harmless Error Review

Our conclusion that the district court erred in admitting the James video does not end our inquiry: we must still review to see if the error was harmless. An evidentiary error is harmless if "it is highly probable that the error did not contribute to the judgment,"[108] which "requires that the court possess a sure conviction that the error did not prejudice the defendant."[109]

Here, we find that the district court's erroneous admission of the James video was harmless. As previously described, the government presented abundant evidence of

---

[105] 295 U.S. 78, 88 (1935).

[106] *Id.*

[107] *Id.*

[108] *U.S. v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (internal quotation marks omitted).

[109] *Id.* at 1265 (internal quotation marks omitted).

the drug-trafficking conspiracy, the firearm charge, and the defendants' liability for each of these counts.[110] Therefore, it is "highly probable that the error did not contribute to the judgment."[111]

In concluding that this error was harmless *under the circumstances here*, we caution that the doctrine of harmless error is not a license to engage in whatever prejudicial practices an attorney might feel he or she can get away with because the harmless error analysis will inoculate the end result against reversal on appeal.[112]

3. Rule 404(b) Analysis

Davis alone argues that evidence of the James murder was extrinsic to the charged crimes and therefore subject to Federal Rule of Evidence 404(b).[113] Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[114] Davis contends that the evidence of the James

---

[110] Ironically, the video could easily have been excluded under Rule 403 because it was so redundant given the other evidence of the James murder.

[111] *Zehrbach*, 47 F.3d at 1265.

[112] Chief Judge McKee notes that he will begin naming attorneys who engage in such tactics in his opinions in order to deter such conduct. He hopes that this practice will stress that harmless error review is not an invitation to resort to unduly prejudicial tactics merely because the evidence is strong enough to obtain a conviction that will likely be immunized against reversal by the harmless error doctrine. He invites his colleagues to do the same.

[113] The James murder evidence is intrinsic to the conspiracy and firearm charges. *See infra* Part IV.c.2. The murder of a rival drug dealer who was encroaching on the DDTO's turf directly proves the charged crimes of drug-trafficking conspiracy and use of a firearm in furtherance of that conspiracy. However, we need not reach this issue. Even if the murder evidence was extrinsic, Rule 404(b) only reaches the bad acts of a defendant himself—not the bad acts of others.

[114] Fed. R. Evid. 404(b).

murder should have been excluded under Rule 404(b). However, Rule 404(b) only applies to evidence of a *defendant's* other bad acts or crimes, not those of third parties. In *Huddleston v. United States*,[115] the Supreme Court explained, "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and *that the defendant was the actor*."[116] The government stipulated that Davis did not commit the James murder. Accordingly, Rule 404(b) simply does not apply.[117]

B. *The Rosario Assault*

In addition to the evidence of the James murder, the government presented evidence that DDTO associates assaulted a former member of the organization named Anthony Rosario. Rosario was a trafficker who obtained heroin from Mykal Derry until they had a falling out. When Rosario stopped buying heroin from Derry, Derry and another DDTO associate kidnapped Rosario, stole his car, and assaulted him. This assault occurred on October 30, 2010. When Rosario and his mother reported the kidnapping and assault to the police, Derry had his cousin, Kevin Washington, shoot Rosario on April 17, 2011, paralyzing him. The district court permitted the government to present evidence of this assault at trial over the appellants' Rule 403 objection.

---

[115] 485 U.S. 681, 689 (1988).

[116] *Id.* (emphasis added).

[117] *See id.*; *see also United States v. Brady*, 26 F.3d 282, 287 (2d Cir. 1994) ("Neither Montano, Brady nor their co-defendants committed any of the murders testified about at their trial. The record contains no indication that the government ever attempted to make such an implication, nor that the court permitted it to be made. . . . Therefore, Rule 404(b) is inapplicable to the evidence presented in this case."); *United States v. Diaz*, 878 F.2d 608, 616 (2d Cir. 1989) ("In this conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible, and such proof ordinarily does not raise any Rule 404(b) question." (internal citation omitted)); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979) (same).

On appeal, Bailey alone continues to contest the admission of this evidence.[118] We conclude that the evidence was properly admitted. It was probative of the conspiracy and firearm charges, was not excessively cumulative, and was not unfairly prejudicial to the defendants. As the government explained in its closing argument, "evidence that the DDTO would violently protect its turf against interlopers such as Rosario strongly supported the government theory that, because these four defendants were selling heroin in [the Stanley Holmes Village], they were not mere 'independent buyers' from Derry."[119]

The Rosario evidence was particularly probative because of the timing of the assault. The Rosario assaults occurred on October 30, 2010 and April 17, 2011, earlier in the conspiracy than evidence of the other violent acts DDTO associates committed. Thus, "those assaults [] had a longer time to influence the thinking of others who might consider opposing the DDTO."[120] Finally, the government conceded that none of the defendants were involved in assaulting Rosario. That reduced any potential unfair prejudice.[121] Accordingly, we conclude that the district court did not abuse its discretion in admitting evidence of this assault.

---

[118] Bailey does not object to the district court's on-the-record balancing with respect to the Rosario evidence. The district court included its Rule 403 determination for the Rosario evidence together with the non-video James murder evidence. And, as previously explained, the district court's on-the-record balancing with respect to this point was sufficient to merit deference. Therefore, we review the district court's admission of this evidence for abuse of discretion. "The admission of evidence is an abuse of discretion if the district court's action was arbitrary, fanciful or clearly unreasonable, and we will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view." *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (internal alterations omitted) (internal quotation marks omitted).

[119] Gov't Br. at 78.

[120] *Id.*

[121] *See United States v. Jones*, 566 F.3d 353, 365 (3d Cir. 2009).

C. *Admission of Bailey's Past Conviction under Rule 404(b)*

Just weeks before the official "start" of the charged conspiracy, on September 4, 2010, Bailey was arrested with a .22 caliber semiautomatic handgun, loaded with five rounds of ammunition. He also had 20 grams of cocaine and $867 in cash in his possession. The government charged Bailey with unlawful possession of a handgun and unlawful possession of cocaine with the intent to distribute within 500 feet of a public housing complex (*i.e.*, the Stanley Homes Village). Bailey plead guilty to both charges in juvenile court.

At trial, the district court permitted the government to introduce evidence of this arrest and conviction. The parties agreed to a stipulation that Bailey's firearm was operable. The parties further agreed that certain exhibits related to this incident—the firearm, ammunition, and a series of photos taken at the scene of the arrest—would be admitted in evidence. The district court admitted this evidence as being intrinsic to the charged conspiracy and, in the alternative, as an admissible prior crime under Federal Rule of Evidence 404(b). That rule allows evidence of uncharged past crimes to be admitted if it is not used to establish a defendant's criminal propensity. Under the rule, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[122] Both at trial and now on appeal, Bailey challenges the admission of this evidence. Bailey argues that evidence was not intrinsic to the charged crimes and not admissible evidence of uncharged conduct under Rule 404(b). He also contends this evidence should have been excluded under Rule 403.

1. Standard of Review

As previously explained, we generally review district courts' evidentiary rulings for abuse of discretion.[123] However, our review of whether evidence falls within the scope of Rule 404(b) is plenary.[124] Once we determine that evidence falls within the scope of Rule 404(b), we review the

---

[122] Fed. R. Evid. 404(b).
[123] *See United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010).
[124] *See id.*

district court's decision to admit the evidence for abuse of discretion. The "admission of evidence is an abuse of discretion if the district court's action was arbitrary, fanciful or clearly unreasonable."[125] We "will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view."[126] As is true with decisions under Rule 403, district courts are not entitled to this deferential standard of review when they fail to articulate non-propensity reasons for the admission of the contested evidence on-the-record.[127] If the court admits evidence of uncharged acts, the district court must "articulate, with precision, a chain of inferences that does not contain a propensity link."[128] And, "[o]f course, 'a mere recitation of the purposes in Rule 404(b)(2) is insufficient.'"[129] When confronted with a proffer under Rule 404(b), a district court should "require the prosecution to explain exactly *how* the proffered evidence should work in the mind of a juror to establish the fact the government claims to be trying to prove."[130]

Here, the district court did articulate a chain of inferences that did not include propensity. At trial, Bailey argued that he should not be liable for the firearm charge because he did not have any knowledge that other DDTO members would carry guns, use guns, or discharge guns. Therefore, his knowledge was critical to the government's

---

[125] *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) (internal alterations omitted) (internal quotation marks omitted).

[126] *Id.*

[127] *See United States v. Brown*, 765 F.3d 278, 294 (3d Cir. 2014); *United States v. Caldwell*, 760 F.3d 267, 277 (3d Cir. 2014), *reh'g denied* (Sept. 16, 2014); *Unites States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992).

[128] *Caldwell*, 760 F.3d at 277.

[129] *Brown*, 765 F.3d at 294 (quoting *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013)) and citing Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:28, at 730 ("[I]t is lamentably common to see recitations of laundry lists of permissive uses, with little analysis or attention to the particulars.")).

[130] *Id.*

case and conversely, his defense. The district court realized this and offered the following explanation of how Bailey's past arrest shows something other than his mere propensity to carry weapons:

> [I]f three weeks . . . before the start of . . . the conspiracy, he is arrested with drugs . . . with intent to distribute, and he's carrying a gun, that's proof of his knowledge that in engaging in a drug conspiracy or drug transactions, that other members of the conspiracy will use guns in connection with the possession and distribution[;] . . . knowledge that it's part of the warp and woof of the conspiracy that guns will be used to carry out the purposes of the conspiracy, which might be protection from those who would rob them of money, keeping out competition in the area where they operate, battling – forestalling apprehension, should they be confronted by the police. . . . [I]n this case, I think the knowledge prong is very important in that . . . the prosecution can argue to the jury that Mr. Bailey knew full well that in the drug business, *particularly in that very area of Atlantic City*, involved the possession of weapons, you know, for the sole reasons I just articulated a minute ago.[131]

As the district court explained, Bailey's conviction tends to demonstrate his knowledge that the drug business in this area of Atlantic City was a particularly violent enterprise; one where drug dealers were frequently armed. This is a valid, non-propensity reason to admit Bailey's past conviction.

2. Admissibility of Bailey's Past Conviction Evidence under Rule 404(b)

Bailey argues that, contrary to the district court's ruling, the evidence of his past conviction was not intrinsic. If the conviction evidence is intrinsic to the charged crimes, then we need not conduct the 404(b) analysis.[132] Only

---

[131] Bailey J.A. 2228-29 (emphasis added).
[132] *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).

extrinsic evidence is subject to Rule 404(b): intrinsic evidence does not constitute a prior bad act at all; instead, it directly proves the charged crime. In *United States v. Green*,[133] we examined the difference between intrinsic and extrinsic evidence at length. There, we clarified:

> [W]e will reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it directly proves the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of *other* crimes, wrongs, or acts. If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. Second, uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime. But all else must be analyzed under Rule 404(b).[134]

The Bailey conviction fails to meet either definition of intrinsic evidence. First, Bailey's prior arrest and conviction did not "directly prove" the charged offense. Bailey was arrested a month before the conspiracy even began. Bailey's conviction could not directly prove Bailey's role in a conspiracy that had not yet even begun.[135] In addition, Bailey's arrest was not contemporaneous with the charged crime. Although proof of conspiracies is not limited to the charged start and end dates, the indictment's temporal parameters usually delineate the boundary between intrinsic and extrinsic evidence. Evidence outside the temporal bounds of the indicted conspiracy may still be admissible, if it satisfies the restrictions of Rule 404(b).

---

[133] *Id.*

[134] *Id.* at 248-49 (emphasis in original) (internal quotation marks and citations omitted).

[135] *See United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (holding that evidence of an earlier-in-time crime that was nearly identical to and factually connected to a charge in the indictment could not be considered intrinsic evidence of the crime charged). This Court cited *Bowie* approvingly in *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).

Because Bailey's past conviction was not intrinsic to the charged crimes, it should only have been admitted if consistent with Rule 404(b)'s requirements. To be admissible under Rule 404(b), evidence of uncharged crimes or bad acts must: (1) have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) if the defendant requests it, the court must instruct the jury to consider the evidence only for the limited purpose for which it is admitted.[136] Here, the second[137] and fourth[138] requirements are undisputedly met. Accordingly, we only need to consider whether evidence of Bailey's conviction had a proper evidentiary purpose and satisfied Rule 403.

---

[136] *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *see also United States v. Caldwell*, 760 F.3d 267, 276-77 (3d Cir. 2014), *reh'g denied* (Sept. 16, 2014).

[137] Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. That definition is "very broad." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). Here, the fact that Bailey possessed cocaine with the intent to distribute while in possession of a firearm in the Stanley Holmes Village tends to show his awareness of firearm use during drug trafficking in that area.

[138] The district court instructed the jury that Bailey's prior arrest and conviction "was admitted only for a limited purpose, that is, as evidence of Kareem Bailey's knowledge or the reasonable foreseeability to Kareem Bailey of the use, carrying and/or possession of firearms in furtherance of drug trafficking." Bailey J.A. 3516. The court specifically told the jury that it could "not consider the evidence that these other acts as a substitute for proof that he committed any of the crimes for which he is charged in this case. You may not consider this evidence as proof that Kareem Bailey has had— has a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that Kareem Bailey may have committed the other acts, he must have also committed the acts charged in the indictment." Bailey J.A. 3518-19. The district court also gave a similar instruction in the final charge to the jury.

The government claims that Bailey's past conviction had a proper purpose because it tends to demonstrate that Bailey knew drug dealers in the Atlantic City area—specifically the Stanley Holmes Village—frequently used firearms in the course of their trafficking activities. We agree.

The circumstances here are quite similar to those we considered in *United States v. Boone*.[139] There, a defendant was charged with numerous offenses including conspiracy to distribute cocaine.[140] At trial, he argued that he was merely an ignorant "go-fer" without any knowledge of the contents of the bags that he admitted delivering.[141] The trial court allowed the government to introduce evidence of Boone's two prior convictions for cocaine distribution to rebut his "go-fer" defense.[142] We affirmed, noting that the evidence of his prior convictions was "admitted to show that Boone was familiar with drug-trafficking practices."[143] As we explained, Boone's familiarity with drug trafficking practices and his ability to recognize cocaine and its packaging were relevant to the question of whether he knew what he was doing when he delivered bags of cocaine to certain people.[144]

Like Boone, Bailey contests his knowledge of drug-trafficking practices in Atlantic City. And, as in *Boone*, the government seeks to rely on Bailey's past conviction to prove he did possess that knowledge. This chain of logic does not rely on improper propensity inferences. The temporal and geographic proximity of Bailey's past conviction to the charged crime tends to show that Bailey knew drug traffickers in this area possessed firearms in the course of their drug trafficking.

3. Admissibility of Bailey's Past Conviction under Rule 403

Finally, we must assess whether the danger of unfair prejudice associated with the evidence of Bailey's past conviction substantially outweighed its probative value. Bailey has not contested the district court's on-the-record

---

[139] 279 F.3d 163 (3d Cir. 2002).

[140] *Boone*, 279 F.3d at 171.

[141] *Id.* at 187.

[142] *Id.*

[143] *Id.*

[144] *Id.*

balancing with respect to this issue, and we agree that it was sufficient. The district court discussed the probative value of Bailey's past conviction while still acknowledging its potential for unfair prejudice. Therefore, we review the district court's Rule 403 decision regarding Bailey's past conviction for abuse of discretion.[145]

The risk of unfair prejudice inherent in the evidence of Bailey's past conviction is obvious. It would have been difficult for the jurors to hear this evidence and not make the impermissible propensity inference. "Although the government will hardly admit it, the reasons proffered to admit prior bad act evidence may often be potemkin village, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."[146]

Although this potential for unfair prejudice is significant, so too was the probative value of this evidence. As the district court recognized, this past conviction was directly relevant to Bailey's knowledge that drug dealers at the Stanley Holmes Village used firearms. Bailey's arrest one month prior to the charged conspiracy at the same location as the DDTO's trafficking activity is compelling evidence of his knowledge. Without this past conviction, the government's case for Bailey's *Pinkerton* liability was significantly weaker. As previously discussed, the only other evidence of Bailey's culpability on the firearm charge was 1) testimony from Young that Bailey possessed "firearms at times while he was selling drugs or engaged in the business of selling drugs in and around" the Stanley Holmes Village and other locations,[147] and 2) evidence that after Bailey was arrested,

---

[145] *See United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992) ("When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling. Where, however, the court failed to perform this analysis, or where its rationale is not apparent from the record, there is no way to review its discretion." (internal citation omitted)).

[146] *Id.* at 886.

[147] Bailey J.A. 2352.

Derry told Bailey on a phone call that he was glad that Bailey "wasn't strapped" (armed) when he was arrested.[148]

Accordingly, we cannot say that the district court's analysis and resulting conclusion regarding Bailey's past conviction was "arbitrary or irrational."[149] In *United States v. Vega*,[150] we affirmed the district court's admission of evidence that the defendant—on trial for conspiracy to distribute and possession with intent to distribute heroin—participated in a drug conspiracy a few years earlier.[151]

> [T]he Government's evidence of Vega's participation in the 1997 drug conspiracy was of critical importance because Vega had denied knowledge of the [charged] 1999 conspiracy . . . . The evidence was highly probative in demonstrating that Vega knew he was receiving a drug package . . . and that he was connected to Jairo, who was a participant in both the 1997 and [charged] 1999 conspiracies. Although the evidence undoubtedly had some prejudicial value, we cannot say that the Court abused its discretion by concluding that this prejudicial value was not so unfair as to outweigh its probative value.[152]

We affirm the district court's admission of the Bailey conviction.

## V. MISTRIAL CLAIMS

Lastly, Bailey, Macon, and Venable contend that the district court abused its discretion when it denied their motions for mistrials based on statements witnesses and the

---

[148] Supplemental Appendix at 31-32 (Government Exhibit 192.1).

[149] *United States v. Schneider*, 801 F.3d 186, 198 (3d Cir. 2015) (internal quotation marks omitted).

[150] 285 F.3d 256, 263 (3d Cir. 2002).

[151] *Id.* at 260.

[152] *Id.* at 263 (citing *United States v. Palma–Ruedas*, 121 F.3d 841, 852 (3d Cir. 1997), *rev'd on other grounds*, 526 U.S. 275 (1999) and *United States v. Echeverri*, 854 F.2d 638, 643-44 (3d Cir. 1988)).

government made at trial.[153] Bailey and Venable argue that the district court should have declared a mistrial after a prosecution witness, Atlantic City Police Detective Thomas Holton, mentioned that DDTO associates sexually assaulted Anthony Rosario during the October 2010 attack. The prosecution had previously agreed not to introduce the "sexual assault aspect" of the Rosario attack at trial.[154] When Detective Holton took the stand, he described his interview with Rosario and his mother after the attack. He testified that, "[t]he mother first did most the talking and then Anthony did some of the talking. The mother was visibly upset and shaken, as was Anthony. They advised that he was taken to a house, sexually assaulted—."[155] The government immediately cut Holton off, ending his explanation.[156] But defense counsel objected, and all four defense counsel moved for a mistrial at sidebar.[157] The district court denied the motion, but offered to give a limiting instruction. Defense counsel rejected this offer, fearing it might draw more attention to the improper testimony. The sexual assault issue never resurfaced at trial.

In reviewing the district court's denial of the mistrial motion based Holton's comments, we assess three factors. We consider: (1) whether the remarks were pronounced and persistent, (2) the strength of the other evidence, and (3) curative actions taken by the district court.[158] Here, Detective Holton's single, fleeting reference to the sexual nature of the Rosario assault did not generate the sort of prejudice that

---

[153] "We review the denial of a motion for a mistrial based on a witness's allegedly prejudicial comments for an abuse of discretion." *United States v. Riley*, 621 F.3d 312, 335-36 (3d Cir. 2010), *as amended* (Oct. 21, 2010) (internal quotation marks omitted).

[154] Bailey J.A. 2240-41.

[155] Bailey J.A. at 3228.

[156] *Id.*

[157] During the sidebar, the prosecutor indicated that he had not had time to speak with Detective Holton that morning because Holton had been running late. The prosecution also clarified that it had no intention of bringing out that testimony, which it had previously agreed not to elicit.

[158] *Riley*, 621 F.3d at 336.

necessitates a mistrial.[159] The government promptly cut off Detective Holton's testimony, and the jury did not receive any details regarding this issue. Furthermore, Holton's comment did not in any way suggest that any of these four defendants were involved in this attack on Rosario. Accordingly, we reject the contention that this statement should have resulted in a mistrial.

Venable also argues that the district court abused its discretion in failing to grant a mistrial on the basis of a second inconsequential remark. During their investigation of the DDTO, two officers collected spent .22 shell casings from the scene of a shooting at the home of Barbara German. At trial, Kareem Young testified that he observed Venable with a firearm on multiple occasions, in particular a .22 caliber rifle with a sawed-off barrel. Young also testified that Venable admitted to him that Venable was involved in the Barbara German shooting. Towards the end of the defendants' trial, forensic examiners discovered that the spent shell casing from the German shooting matched Venable's .22 caliber rifle. Because of the late disclosure of this report, the government agreed that it would not present evidence of that ballistic match or the "head stamp" (a distinctive marking on the top of a bullet) of the recovered shell casing.

Nevertheless, at trial, Detective Michael Tracy accidentally testified that he discovered a casing of a ".22 caliber, head stamp super X"[160] bullet at the scene of the German shooting. The prosecutor immediately cut Tracy off and told him: "don't get into the head stamp."[161] Venable objected, and moved for a mistrial.[162] The district court denied the motion.

Nothing in Tracy's testimony or any other witness's testimony connected Venable's .22 caliber rifle to the "super

---

[159] *See United States v. Long*, 748 F.3d 322, 328 (7th Cir. 2014) (single fleeting reference to a murder unconnected to the case introduced inadvertently and never discussed again over the course of a lengthy trial does not give rise to a mistrial).

[160] Bailey J.A. 3472.

[161] *Id.*

[162] The prosecutor indicated that the witness had been instructed not to mention the head stamps.

X" head stamp. It is unlikely that the jurors even understood the relevance of Tracy's reference. Therefore, the district court did not abuse its discretion in denying Venable's motion for a mistrial.

Finally, Macon contends that the government constructively amended its indictment during its rebuttal summation, entitling the defendants to a mistrial. During summation, Macon's attorney displayed a photograph of Macon with a group of men who were DDTO rivals. Macon's counsel argued that the photograph proved Macon was not a DDTO associate because if he were, he would not have posed with rival gang members. In rebuttal, the government argued that the photograph had been taken in mid-March 2013, after Mykal Derry had already been arrested and the "Derry brothers' reign on the streets of Atlantic City [was] coming to a close."[163] The indictment charged that the drug-trafficking conspiracy ran until the end of March 2013. Macon asserts that the government's statement regarding the Derry's brothers' "reign" constructively amended the indictment by shortening the period of the alleged conspiracy.

The argument hardly merits discussion. The government never asserted that the conspiracy had formally ended in mid-March 2013. It merely posited the common-sense inference that Mykal Derry's influence had waned due to his incarceration. Furthermore, Macon's arguments missed the point of the constructive amendment doctrine. The bar on constructive amendments seeks to ensure that the jury does not convict the defendant for *uncharged* conduct.[164] Here, the government's rebuttal argument actually *narrowed* the scope of the conspiracy, which, if anything, may have assisted the defendant rather than prejudiced him. Accordingly, we find that the district court did not abuse its discretion in denying Macon's motion for a mistrial.

## VI. CONCLUSION

For all the reasons set forth above, we will affirm the judgments of conviction of each of these four defendants.

---

[163] Bailey J.A. 4689.
[164] *United States v. Miller*, 471 U.S. 130, 144-45 (1985).